Hope Phelps (La. Bar No. 37259)
William Most (La. Bar No. 36914)
MOST AND ASSOCIATES
201 St. Charles Ave., Ste. 2500, # 9685
New Orleans, LA 70170
Tel: (504) 509-5023
Email: hopeaphelps@outlook.com

Aaron B. Zisser [Cal. Bar No. 302926] (*pro hac vice*)
ZISSER LAW OFFICE
5706 Cahalan Ave., # 23730
San Jose, CA 95153
Telephone: (669) 228-5154
Fax: (408) 404-8980
Email: aaron@zisserlawoffice.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JUDITH SANTANO, <br><br>          Plaintiff, <br><br>    vs. <br><br> TULANE UNIVERSITY, BOARD OF TULANE, JORDAN KARUBIAN, ERICA WOODLEY, JONATHAN SMALL, MARCUS FOSTER, TIFFANY SMITH, and AVERY PARDEE, DOES 1-20 <br><br>          Defendants. | Case No.: 2:24-2478 <br><br> **FIRST AMENDED COMPLAINT FOR DAMAGES** <br><br> 1. **TITLE VII – RETALIATION** <br> 2. **TITLE VII – INADEQUATE INVESTIGATION** <br> 3. **TITLE VII – ERRONEOUS OUTCOME** <br> 4. **TITLE IX – RETALIATION** <br> 5. **TITLE IX – FAILURE TO INVESTIGATE** <br> 6. **STATE LAW – RETALIATION AND SEX DISCRIMINATION** <br> 7. **NEGLIGENT SUPERVISION** <br> 8. **NEGLIGENCE** <br> 9. **RESPONDEAT SUPERIOR** <br> 10. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** <br> 11. **BREACH OF CONTRACT** <br> 12. **WHISTLEBLOWER REPRISAL** <br><br> **JURY TRIAL DEMANDED** |

## I.    PRELIMINARY STATEMENT

1.    Plaintiff Judith Santano brings this suit against her employer and educational institution, Tulane University, and against individual defendants, alleging violations of Title IX of the Education Amendments, Title VII of the Civil Rights Act, and state law.

2.    Defendants retaliated against Plaintiff for filing a complaint about sexual assault, terminated her from an important program based on unfounded and uninvestigated allegations, failed to provide supportive measures, and conducted wholly inadequate investigations into her allegation of retaliation and into the underlying sexual assault allegations.

## II.    INTRODUCTION

3.    Plaintiff is and was a PhD candidate at Tulane University who studies avian ecology. During research in Ecuador under the auspices of the university, Plaintiff was sexually assaulted and sexually harassed by a staff member of the research facility with which the university was partnering.

4.    Upon reporting this conduct, Plaintiff experienced retaliation by members of the university's faculty with the knowledge of a top administrator. Dr. Jordan Karubian, senior professor in the Department of Ecology and Evolutionary Biology at Tulane, retaliated against Plaintiff because she blew the whistle about an experience with sexual assault that pointed to a broader toxic culture at the research program in Ecuador, which was infected with rampant sexual harassment, and because she subsequently complained about Defendant Karubian's response to her report of assault.

5.      The same act of retaliation was also a denial of any due process provided as a matter of contract between Plaintiff and Tulane, i.e., provided in their policies for addressing allegations of sexual harassment.

6.      The university also profoundly mishandled the internal administrative process to address Plaintiff's complaints of assault and retaliation, and Plaintiff encountered numerous significant deficiencies in the Title IX and Title VII processes with respect to both the investigation of her allegation of retaliation and the response to the underlying sexual assault allegations.

7.      This failed response is due in large part to the University's profoundly flawed structure for addressing sexual assault and retaliation, including the Title IX coordinator's lack of independence, authority, and involvement in the investigation and hearing process.

8.      The university's retaliation and flawed response both to the underlying harassment and assault and to the retaliation has compounded the trauma from the underlying conduct in Ecuador. It also resulted in the loss of significant research and employment opportunities, with tangible academic and economic consequences.

### III.    JURISDICTION AND VENUE

9.      Plaintiff brings this action pursuant to Title VII of the Civil Rights Act, § 701 *et seq.*, as amended, 42 U.S.C.A. § 2000e *et seq.*, and Title IX of the Education Amendments Act, 20 U.S.C. §§ 1681, *et seq*.

10.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights). Plaintiff's state-law claims are within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

11.     This Court has supplemental jurisdiction over the state law claims asserted herein

pursuant to 28 U.S.C. § 1376 because the claims form part of the same case or controversy

arising under the United States Constitution and federal law.

12.    Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391,

as the underlying acts, omissions, injuries and related facts occurred in New Orleans, Louisiana,

and because Defendants reside in the District. This is an action for damages and such other and

further relief as may be consistent with law.

## IV.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

13.    Plaintiff has exhausted all administrative remedies by filing a charge with the

Equal Employment Opportunity Commission regarding retaliation on September 4, 2024. The

EEOC issued a right to sue letter on September 5, 2024.

14.    Plaintiff filed an additional charge on November 18, 2024, regarding Tulane's

inadequate investigations of the sexual assaults and of retaliation. The EEOC issued a right to

sue letter on November 19, 2024.

## V.    PARTIES

15.    Plaintiff Judith Santano is an adult citizen of the State of Louisiana and domiciled

in the Eastern District of Louisiana. She enrolled at Tulane as a PhD candidate in Fall 2021,

remains enrolled there, and experienced retaliation and an inadequate investigation into her

sexual harassment and retaliation allegations there. As a graduate student, she also worked as a

research assistant and teacher's assistant, for which she received payment as an employee from

Tulane.

16.    Defendant Tulane University ("Tulane" or "University") is a private not-for-profit

university located in New Orleans, Louisiana, with its principal place of business there. At all

times relevant to this Complaint, Tulane conducted business in the Eastern District of Louisiana

and had more than twenty (20) employees. Tulane operates programs in receipt of federal funds and is thus covered by Title IX's prohibition on sex-based discrimination.

17.    Defendant Board of Tulane is the governing body for Tulane.

18.    Defendant Karubian was assigned as Plaintiff's research advisor. He is and was at all times relevant herein a professor employed by Tulane. He also coordinated Tulane's collaboration with Fundación para la Conservación de los Andes Tropicales ("FCAT"), a research facility in Ecuador and supervised Plaintiff's work there.

19.    Defendant Erica Woodley is and was at all times relevant herein the Dean of Students at Tulane.

20.    Defendant Marcus Foster was the Title IX coordinator at Tulane from July 2022 until August 30, 2024.

21.    Defendant Tiffany Smith is and was, since July 2022, the Director of Institutional Equity and Resolution Management. Defendant Smith's office, the Office of Institutional Equity ("OIE") oversaw the university's investigations into Plaintiff's allegations.

22.    Defendant Jonathan Small is and was at all times relevant herein Tulane's Vice President for Human Resources and Institutional Equity. Defendant Small supervises the work of Defendant Smith and acted as the appeal officer regarding the university's investigation into Plaintiff's allegations of sexual assault.

23.    Defendant Avery Pardee was contracted by Tulane to conduct the university's investigations into the allegations by Plaintiff that she was sexually assaulted during the summer of 2022 while conducting research at FCAT and that Karubian retaliated against Plaintiff for reporting the sexual assaults that occurred at FCAT. Defendant Pardee is an attorney with the law firm Jones Walker LLP but was conducting her investigations on behalf and at the request of

First Amended Complaint for Damages – Jury Demand

the university.

24.     Defendants DOES 1-20 are additional employees or agents of Tulane who were responsible for retaliation against Plaintiff and/or the inadequate response to Plaintiff's reports of sexual assault and retaliation. Plaintiff alleges that each of the Defendants named as a "DOE" was in some manner responsible for the acts and omissions alleged herein.

25.     Plaintiff is informed and believes, and thereupon alleges, that at all times mentioned herein Defendants worked in Orleans Parish, State of Louisiana. Plaintiff is informed and believes, and thereupon alleges, that at all times mentioned herein Defendants were employees, agents, and/or servants of the Tulane and acted within the course and scope of said employment, agency and/or service.

26.     Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1 through 20, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff is informed, believes, and alleges that each of the fictitiously named defendants is legally responsible, intentionally, negligently, or in some other actionable manner, for the events and happenings hereinafter referred to and described, and thereby illegally caused the injuries, damages, and violations and/or deprivations of rights hereinafter alleged. Plaintiff will seek leave of Court to amend this Complaint and state the true names and/or capacities of said fictitiously named defendants when the same have been ascertained.

27.     The reason why Plaintiff is ignorant of the true names and capacities of Defendants sued herein as Does, inclusive, is that same have been unascertainable as of the date of filing of this complaint and many of their records may be protected by state statute and can only reasonably be ascertained through the discovery process.

28.     Except as otherwise indicated, each defendant is a joint tortfeasor with every

other defendant under Louisiana Civil Code Art. 2324.

## VI.    FACTS

### A.  Plaintiff was coerced into sex during a Tulane University field research program in Ecuador during the summer of 2022

29.    During the summer of 2021, Plaintiff was conducting research at FCAT as part of her Ph.D program and, during portions of her time at FCAT, as a graduate research assistant.

30.    Plaintiff was compensated for her work as a research assistant.

31.    During that summer, Beto Gonzalez, a staff member at FCAT, made sexually explicit comments to Plaintiff.

32.    Plaintiff returned to FCAT during summer 2022. On June 25, 2022, Gonzalez asked to engage in sexual contact with Plaintiff in the back seat of a truck, but Plaintiff declined.

33.    Later that summer, Gonzalez coerced Plaintiff into sexual intercourse without her consent on two occasions. On both occasions, Plaintiff told Gonzalez she did not want to have sex with him. On the first occasion, Gonzalez ignored Plaintiff when she told him she did not want to have sex with him and that she did not want him to remove her clothing.

34.    After the first assault, Plaintiff indicated to Gonzalez that the encounter was not consensual, asked him why he did it, and told him not to do that again.

35.    Subsequently, Gonzalez ignored Plaintiff's request and assaulted her a second time.

36.    On both occasions, Plaintiff was too confused and in shock to further rebuke Gonzalez' advances, and he penetrated her vagina with his penis without her consent.

### B.  Plaintiff's relationship with Defendant Karubian

37.    Defendant Karubian served as Plaintiff's PhD advisor from the time of her

enrollment at Tulane in the fall of 2021.

38.     Defendant Karubian supervised and oversaw Plaintiff's work as a research assistant and teaching assistant both during Plaintiff's time at FCAT and while taking classes or conducting research at Tulane.

39.     Defendant Karubian had continually expressed exceptional confidence in Plaintiff, including calling her an "integral" member of his lab group and the FCAT community.

40.     Plaintiff was heavily recruited by Defendant Karubian and was provided substantial funding.

41.     Plaintiff had, in large part due to Defendant Karubian, considerable responsibility, supervisory responsibilities, and leadership roles at FCAT and in Defendant Karubian's lab.

42.     From the outset, Defendant Karubian expected Plaintiff to provide a great deal of labor to represent FCAT.

**C.  FCAT and Defendant's involvement in FCAT**

43.     Defendant Karubian was and is a senior professor in the Department of Ecology and Evolutionary Biology at Tulane.

44.     Defendant Karubian was a founding member of FCAT, which was established in 2011.

45.     FCAT hosts graduate student researchers from Tulane and other universities. It also hosts undergraduate students from Tulane.

46.     FCAT suffered from a toxic culture that was infected with rampant sexual harassment.

47.     Defendant Karubian had every reason to insulate FCAT from any scrutiny that would result from Plaintiff's report. He was heavily invested professionally and personally in the

First Amended Complaint for Damages – Jury Demand

program.

48.    Upon information and belief, Gonzalez was a close colleague and friend of Defendant Karubian's. Defendant Karubian was aware of the long-standing issues with sexual harassment at FCAT, and Plaintiff's report risked exposing his ongoing inaction.

**D. Plaintiff's report was initially mishandled**

49.    Plaintiff reported the summer 2022 assaults by Gonzalez to Defendant Karubian and an FCAT staff member in February 2023.

50.    Defendant Karubian did not forward Plaintiff's report to the university until on or around May 4, 2023, in violation of his duty under university rules to *immediately* forward such reports to the university.

51.    This substantial delay in turn caused a delay in the investigation and in the provision of supportive measures.

52.    Defendant Karubian spoke with Gonzalez and other members of the community in or around June 2023 about the allegation of assault *after* reporting the assault to the Title IX office and despite his close relationship with the accused, thus interfering with the university's investigation and violating her right to privacy.

53.    On or around June 2023, Plaintiff discussed with Defendant Karubian her concerns about how he had handled her report.

54.    In a July 18, 2023 email, Defendant Karubian acknowledged he mishandled his response to Plaintiff's report of sexual abuse and that she had raised concerns about sexual harassment at FCAT.

55.    Defendant Karubian explicitly indicated in the email to Plaintiff that he hoped to continue working with her.

First Amended Complaint for Damages – Jury Demand

### E. August 2023 meeting

56.     In early August 2023, having become disenchanted and frustrated with Karubian, Plaintiff asked professors Sunshine Van Bael and Hannah Frank to be her co-advisors.

57.     Plaintiff had already notified Van Bael and Frank regarding her disappointment with how Karubian had handled her report about the sexual assaults.

58.     Van Bael and Frank declined Plaintiff's request.

59.     In August 2023, Plaintiff had a meeting with Frank, Van Bael, and Karubian to discuss her research and her relationship with Karubian. Among other topics, they discussed Plaintiff's disappointment with how Karubian had handled her reports. She told the group that she felt she was being treated as the problem.

60.     Karubian indicated he intended to continue as her advisor.

### F. Termination of Plaintiff

61.     On November 30, 2023, Plaintiff's advisory committee issued her a letter, which Defendant Karubian drafted and signed.

62.     The letter indicated to Plaintiff that she was being terminated from Karubian's advisory.

63.     Karubian knew that such action would include denying Plaintiff the opportunity to continue researching at FCAT.

64.     Plaintiff's new advisor, Van Bael, confirmed to Plaintiff that she would only serve as Plaintiff's replacement advisor if Plaintiff agreed she would not return to FCAT.

65.     The letter enumerated reasons for the action other than her reporting her sexual assaults or her displeasure with Karubian's handling of her reports of sexual assault.

66.     The enumerated reasons included allegations of misconduct by Plaintiff while she

was at FCAT.

67.     These stated reasons for terminating Plaintiff from Karubian's advisory were pretexts, as Plaintiff had received positive evaluations of her performance, including from Karubian himself, and the allegations of inappropriate conduct by Plaintiff were never investigated or subjected to the university discipline processes.

68.     Defendant Karubian rushed the termination letter without giving his colleagues on the advisory committee adequate time to review it.

69.     He issued the letter while the university's contracted investigator was in Ecuador interviewing witnesses regarding Plaintiff's complaint of sexual assault.

70.     Defendant Karubian feared exposure of the problems infecting FCAT, problems that Defendant Karubian himself explicitly acknowledged, motivating him to take action against Plaintiff.

71.     Defendant Karubian terminated Plaintiff without first reporting to the Title IX office the allegations against Plaintiff that he claimed formed the basis for her termination.

72.     He thus deprived her of her procedural rights under university policy.

73.     Karubian was not interested in uncovering the truth and instead focused only on sweeping the issues under the rug and discrediting a whistleblower.

74.     Defendant Karubian did not terminate Plaintiff until more than three months after the August 2023 meeting that was the stated basis for the termination.

75.     It was the increasing pressure on him regarding the allegations and his failed response – not his concerns about Plaintiff – that were the motivations for his action against her.

76.     The other faculty members involved in the termination decision, Van Bael and Frank, acceded to Defendant Karubian's actions and failed to intervene to support Plaintiff or

protect her from a violation of her rights, despite knowing that she had voiced concerns about how Defendant Karubian had handled her report of sexual assault and broader harassment at FCAT.

77.     When Plaintiff approached Defendant Woodley on or about December 8, 2023, about the termination, Dean Woodley expressed concern about possible retaliation and about the fact that Plaintiff did not have anyone advising her through the situation, spoke with Professor Karubian, but did nothing to prevent or unwind the action against Plaintiff.

78.     The university failed to provide Plaintiff with supportive measures, which are required under Title IX even absent a formal complaint.

79.     After learning of the potential retaliation, the university did not offer to intervene or to work with the faculty members involved.

80.     It was or should have been immediately evident that terminating Plaintiff based on uninvestigated allegations implicates Title IX and university policy.

81.     It should also have been immediately evident that this action would significantly impact Plaintiff's studies. The November 30, 2023 letter and remediation plan explicitly acknowledged this.

82.     Yet no offer of mediation or support was extended.

83.     Plaintiff was instead left to navigate this extraordinarily stressful situation entirely on her own.

84.     Defendants Smith and Foster failed to intervene when they were notified that Plaintiff may have experienced retaliation.

85.     In February 2024, the university's investigation that was underway regarding Plaintiff's report of sexual assault at FCAT was expanded to address potential retaliation by

Defendant Karubian.

86.     Upon information and belief, Defendants Smith and Foster were notified of the expanded investigation and the nature of the allegation against Defendant Karubian.

87.     Defendants Smith and Foster did not, however, ensure that the allegations against Plaintiff that Defendant Karubian used to justify his action against her were addressed via the process provided for under university policy.

88.     As a result of the action against Plaintiff, she has been unable to return to FCAT to continue her research. Instead, she was relegated during the summer of 2024 to conducting lab research in California for approximately two weeks and otherwise conducting research at Tulane. She did not have the same opportunities to supervise and mentor undergraduate students in the field, study the subjects of her research in nature, or expand the data she was collecting.

**G. The investigation of the sexual assaults was deeply flawed**

89.     The investigation regarding the sexual assaults, conducted by the outside investigator hired by the university, was riddled with serious flaws.

90.     The investigation also took over a year from the time Plaintiff reported the incidents to Karubian in February 2023, concluding on April 10, 2024, with the report being produced to Plaintiff July 29, 2024.

91.     The investigation was decidedly not neutral, did not satisfy Title VII's requirements, and risked exposing Plaintiff and others to further harassment.

92.     The investigator's bias demonstrated in the investigation of the sexual assault also evidences the investigator's bias in the retaliation investigation, and vice versa.

93.     In the investigation report regarding the sexual assaults, the investigator engaged extensively in victim-blaming, made numerous inappropriate assumptions rather than ask

questions, ignored crucial evidence, included inappropriate analysis of Plaintiff's unrelated and prior sexual conduct, misstated evidence, provided an entirely slanted assessment of credibility, and failed to meaningfully analyze the applicable policies.

94.    Examples of deficiencies in the investigation that demonstrated gender bias include the following:

a.    The sole discussion of any potential questions about the respondent's credibility was relegated to a footnote, while the report engaged in extensive discussion of Plaintiff's credibility, almost always questioning it.

b.    The report cited – as evidence of consent to sex and of her lack of credibility – Plaintiff's "open" relationship with her then-partner, Plaintiff's decision to take a walk with Gonzalez, her decision to enter a tent and lie down, her flirtations with other individuals, and the delay in Plaintiff reporting the assault.

c.    The report never explicitly analyzed the university's policy on "affirmative consent" or the many factors enumerated in that policy for determining whether there was "coercion," including the degree of isolation of the location of the incidents.

d.    The report addressed the overall encounter rather than each individual act or portion of the encounter, suggesting that if she consented to, for example, kissing or touching, she consented to everything else, including sexual intercourse.

e.    Indeed, the investigator cited the consensual "relationship" as evidence of consensual sex, even though Plaintiff never denied that she willingly engaged

socially or even romantically with Gonzalez.

f.      The investigator committed a lengthy discussion to the first physical encounter between Plaintiff and Gonzalez, even though Plaintiff never said that this encounter, which essentially consisted of kissing, constituted a sexual assault or even sexual harassment.

g.      The investigator asked Plaintiff a prototypical victim-blaming question: "Why are you putting yourself in this situation?" The investigator never actually discussed Plaintiff's response to this question.

h.      The investigator cited Plaintiff's failure to tell her partner that the incidents constituted assault and cited Plaintiff's text messages to a friend that did not fully describe the incidents the way Plaintiff had described them to the investigator, even though these communications happened immediately after the incidents, as Plaintiff was still processing what happened, texting is not a conducive medium to fully communicate the nuances of the incidents, and the investigator never asked Plaintiff to explain these possible interpretations of these communications or did not address in the investigation report the responses Plaintiff provided in her interview regarding such questions.

i.      The investigator misstated key facts, including whether, during one of her interviews with Plaintiff, Plaintiff described digital penetration. The investigator inaccurately summarized – in 41 words – Plaintiff's account that extended more than 400 words, omitting critical details that Plaintiff shared.

j.      While the investigator – consistent with her experience as a criminal defense attorney – repeatedly and continually questioned Plaintiff's credibility

First Amended Complaint for Damages – Jury Demand

throughout the report, she addressed Gonzalez's credibility only once: in a footnote. The investigator cited almost no evidence that might have bolstered Plaintiff's credibility. For example, the investigator never discussed the level of detail of Plaintiff's account or the impact on Plaintiff, e.g., that Plaintiff sought counseling or described the mental health effects of the incidents.

k.      The investigator engaged in extensive discussion of the allegations that were made against Plaintiff by others at FCAT, even though these witnesses had nothing whatsoever to do with the assault allegations.

95.    Plaintiff was notified of the outcome of the investigation on July 26, 2024.

96.    The investigator further demonstrated disregard for Plaintiff's account or the impact on her when, on July 29, 2024, the investigator decided to share with Karubian the entire investigative report regarding the assault. The investigator made this full report a part of the evidence file in the retaliation case, thus allowing Karubian access to information that had no bearing on the retaliation matter.

97.    The investigator justified this disclosure by pointing to an earlier request by Plaintiff to include the report as part of the retaliation case, even though Plaintiff's request was in fact much narrower, asking only that the *outcome* of the investigation be shared as part of the retaliation investigation.

98.    The full report was also made available to the hearing panel that adjudicated the retaliation case.

99.    When, through her counsel, Plaintiff brought her concern regarding Plaintiff's privacy related to the underlying assaults to the investigator and to the attention of Defendant Smith on July 30, 2024, she received no response and no correction.

First Amended Complaint for Damages – Jury Demand

100.    Tulane did not advise Plaintiff until August 27, 2024 – and it only advised her because she inquired through her counsel – regarding her right to appeal the outcome of the investigation.

101.    In the notice of the right to appeal, Defendant Foster communicated that the usual ten-day period in which to file an appeal would begin upon delivery of that same email communication.

102.    Plaintiff appealed the outcome of the investigation on September 3, 2024.

103.    On November 19, 2024, Defendant Small notified Plaintiff of the outcome of her appeal. That one-and-a-half page decision, signed October 21, 2024, by Defendant Small, upheld the recommendations by Defendant Pardee.

104.    The appeal decision made numerous conclusory findings and inaccurate statements about the process, which demonstrate gender bias. For example:

    a.      It incorrectly claimed that Plaintiff "had several opportunities to raise concerns about Investigator bias prior to her appeal. For example, she (or her advisor) could have objected to questions during or after her interview(s) with the Investigator, or when she was given the opportunity to comment on and edit transcripts of these interviews, or after she received a copy of the draft report to review and comment." Whether or not Plaintiff had opportunities to raise her concerns before the appeal was irrelevant, however, as the appeal was the formal procedure for doing so. Moreover, Plaintiff did, in fact, raise her concerns during the interview with Defendant Pardee, though her appeal focused on analysis and comments in Defendant Pardee's reports that would not have been evident during the interview. Plaintiff did provide comments and edits to the transcripts of her

17
First Amended Complaint for Damages – Jury Demand

interview. And no draft report was provided; as soon as she was provided the full report, she sought to appeal.

b.      It made conclusory findings of "no procedural errors, irregularities or new or substantial evidence," that "the applicable Tulane and FCAT policies were properly followed and applied," that "the fact-finding and analysis of evidence and interviewee credibility was in-depth and appropriate," and that there was "no indication" in Plaintiff's own interview "of coercion." The decision provided no further discussion of any of these findings. For example, it did not address the appeal's concerns about the lack of analysis of any of the factors enumerated in the policy for determining whether coercion occurred, did not address the argument that both verbal and physical pressure occurred, did not address the investigator's failure to address that Plaintiff claimed she told the respondent "no" multiple times or Plaintiff's lengthy description – excerpted at length in the appeal – of the sexual assaults, did not discuss the remoteness of the location of the incidents or other relevant information showing potential coercion, and did not discuss the investigator's discussion of the "consensual" nature of her relationship with the respondent rather than whether the specific conduct was consensual.

c.      The appeal decision did not address Plaintiff's arguments in her appeal that the investigator placed too much focus on Plaintiff walking with the respondent as an indicator of consent, her delay in reporting, her open relationship with her partner, and her framing of the incident in text messages to a friend.

d.      The appeal decision did not discuss the fact that the investigator cited concerns about the respondent's credibility only in a footnote while focusing

extensively on questions about Plaintiff's credibility.

e.       The decision did not acknowledge that even the investigator found some

indication of coercion in Plaintiff's interview statement: "[S]he told Beto that she

did not want to have sex, that she then agreed that he could take her shirt off, but

Beto then stuck his hands down her pants and penetrated her vaginally with his

penis without her consent."

f.       Without any further discussion, the decision found that "the University's

oversight of the investigation was proper." It did not discuss the appeal's concerns

that the Title IX coordinator had too limited a role.

105.    The appeal decision made conclusory findings regarding gender bias on the part

of the investigator. For example, it found, without any further discussion:

a.       "Ms. Pardee is a trained trauma investigator with extensive experience in

investigating sexual misconduct and discrimination claims."

b.       "Her questions were reasonable, probative of the consent-coercion

evaluation and indicated no bias against women in general or the Complainant in

particular." The decision did not discuss the question Plaintiff highlighted, and

which Plaintiff objected to during the interview, in which the investigator asked

why Plaintiff would put herself in the situation in the first place.

c.       "Neither the transcripts of her interviews with Complainant, nor the

written communications between the two, indicate that Ms. Pardee prejudged

[Plaintiff], and the transcripts did not show any hostility or lack of respect toward

[Plaintiff]"

106.    The appeal decision erroneously found that Defendant Pardee's report was 456

First Amended Complaint for Damages – Jury Demand

pages long. The report itself was only 38 pages; the balance were exhibits, including lengthy transcripts.

**H.  The investigation of retaliation by Defendant Karubian was deeply flawed**

107.    The retaliation investigation began on February 20, 2024, when the investigator, Defendant Pardee, notified Karubian that he was under investigation.

108.    The draft investigation report was completed June 3, 2024.

109.    On June 27, 2024, Plaintiff timely submitted a response to the investigative report.

110.    On July 11, 2024, Plaintiff submitted a supplemental response to the investigative report.

111.    A final investigation report was completed July 31, 2024.

112.    The investigation report was flawed in numerous ways.

113.    Among these flaws with the investigation report was a fundamental one that demonstrated the investigator's lack of training and competence in conducting such investigations: the investigation never evaluated potential motives for Karubian to retaliate against Plaintiff or other indications that his actions constituted retaliation.

114.    Defendant Pardee omitted such discussion of potential motives or other indications of potential retaliation despite the fact that, in her response to the initial draft report on June 27, 2024, Plaintiff enumerated these various motives and other indications of potential retaliation and suggested that Defendant Pardee address them in a revised report.

115.    Instead, the investigation improperly focused on the allegations against Plaintiff, even though no formal complaint was filed against Plaintiff and even though those allegations are relevant only insofar as Defendant Karubian was knowledgeable about them.

116.    When Plaintiff, through her advisor, tried to engage Defendant Pardee regarding this concern, the investigator simply doubled down, asking that Plaintiff address all the allegations against her without first explaining to Plaintiff whether such information was relevant to the retaliation investigation, i.e., whether Plaintiff's explanations had been known to Defendant Karubian.

117.    Defendant Pardee had also redacted substantial portions of interview transcripts that were relevant to the retaliation claims, including the various motives Karubian may have had, such as the sexualized culture at FCAT, his close relationship with Gonzalez, his mishandling of her report, and other misconduct by Gonzalez of which Karubian may have been aware.

118.    The investigation was not overseen by the Title IX office or Title IX coordinator. Instead, Defendant Smith oversaw the investigation.

**I. The hearing regarding the retaliation complaint was delayed and deficient**

119.    The investigation report was forwarded on September 9, 2024, to Dennis Kehoe, the individual responsible for coordinating a possible hearing regarding the case.

120.    The report was only forwarded at that time because Plaintiff, through her counsel, inquired with Defendant Smith and the Title IX office, which, when Defendant Smith did not respond, forwarded the report to Kehoe.

121.    On October 3, 2024, Kehoe notified Plaintiff that a panel convened per policy had determined that a panel hearing should occur.

122.    The panel hearing was scheduled for November 6, 2024, but on October 28, 2024, the university notified Plaintiff of the need for further delay due to scheduling challenges.

123.    On November 6, 2024, Kehoe notified Plaintiff that his efforts to schedule a

hearing for November 16 were unsuccessful and that a hearing would likely not occur until December 9, 2024, at the earliest.

124.    After substantial delays, on December 11, 2024, the University held a hearing regarding the retaliation allegation. An outside attorney served as the hearing officer, responsible for vetting questions submitted by the parties and/or their advisors.

125.    The hearing lasted five hours and included testimony from the parties and several witnesses.

126.    The hearing officer refused to pose numerous relevant questions submitted in writing by Plaintiff's advisor, including numerous questions directed at assessing the credibility, including the potential bias, of the witnesses.

127.    The hearing officer dismissed questions about the professional relationships between Karubian and the witnesses and the professional background of the investigator.

128.    The hearing panel submitted its decision to the Provost on December 16, 2024.

129.    The hearing panel's decision was two and-a-half pages long.

130.    The hearing panel erroneously found that Plaintiff "offered no evidence that Dr. Karubian engaged in any form of retaliation," thus ignoring the same evidence of motives and other indications of potential retaliation that Pardee ignored, which Plaintiff also presented during the hearing.

131.    The hearing panel further erroneously determined that Karubian's actions did not cause any harm to Plaintiff, thus ignoring the professional significance of participation in the FCAT program and the emotional and reputational harm she suffered, which Plaintiff presented in the hearing.

132.    Plaintiff was not notified of the Provost's decision (upon reviewing the hearing

panel's decision) within ten business days following receipt of the hearing panel's decision, as required under university policy. By the time of the filing of this amended complaint, more than two months after the hearing and the panel's decision, the university had not notified the parties regarding the final outcome or provided any communication whatsoever regarding the status of the outcome of the hearing.

## J.  The structure of the Title IX office

133.    The poor quality of the investigations and reports may be due to the lack of proper oversight by the Title IX office and/or the lack of qualifications on the part of the investigator, Defendant Pardee, whom the university hired.

134.    Even Human Resources, which would at least bring expertise regarding Title VII obligations, was not involved in the investigations.

135.    While FCAT received the findings from the assault investigation, it did not receive the report or evidence. It therefore lacked the kind of detailed information that would allow it to learn any lessons from the incident – security issues in certain areas of the grounds or during certain activities, the dynamic between older male staff and younger female students, and other potential issues – and take appropriate corrective and preventative action.

136.    The Title IX office essentially conceded that the university was ill prepared to address the nuances involved in incidents occurring abroad, including the assaults Plaintiff experienced in Ecuador: the Title IX coordinator told Plaintiff during a meeting on August 19, 2024, that this was "a glaring blind spot for many of the professionals here" and that the university was building the process "as we were going."

137.    The Title IX coordinator did not actually coordinate the investigation of the retaliation complaint, despite Title IX's requirement that the Title IX coordinator provide

oversight of cases involving retaliation for making a report of sexual harassment or sexual violence.

138.     Instead, the Title IX coordinator served in merely an advisory role and did not supervise the investigator or review Defendant Smith's feedback on the investigation.

139.     Upon information and belief, the Title IX coordinator expressed concern about the investigation and/or report but was unable to influence its direction or improvement.

140.     The Title IX coordinator did not decide on who the investigator would be.

## VII.    DAMAGES

141.     As a direct and proximate result of aforesaid acts and omissions, and the customs, practices, policies and decisions of the defendants alleged in this complaint, Plaintiff suffered and will continue to suffer great emotional, mental and physical pain and injuries, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused and will continue to cause, Plaintiff to sustain general damages in a sum to be determined at trial.

142.     As a further direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the aforementioned Defendants, Plaintiff suffered past and future losses of income that have caused her to sustain economic damages in a sum to be determined at trial.

143.     Plaintiff has experienced profound institutional betrayal at multiple levels, causing her significant trauma and emotional distress that compounded the trauma she experienced as a result of the underlying harassment and sexual misconduct. Her trusted professor sat on her report, interfered with and delayed a proper investigation, and terminated her from her program instead of providing support. Other officials abdicated their responsibility and

independence, both by allowing her termination to go forward and by failing to ensure a proper investigations into the allegation of retaliation and into the allegations of assault. The university she committed to and that showed so much interest in her has not only turned its back on her; it has turned against her.

144.    Plaintiff's termination has significantly impacted her reputation and career. She is doing highly specialized research and selected Tulane and Professor Karubian's program for that reason. Other professors now have a tainted perception of Plaintiff, and her inability to research under Professor Karubian and through FCAT will make it much more difficult for her to accomplish her professional goals and find desirable opportunities after she completes her studies. In her field, relationships and connections are immensely important in identifying and obtaining professional opportunities. In the shorter term, her research and teaching opportunities while still at Tulane will be markedly different and less meaningful.

145.    The investigations into the underlying assault and the retaliation complaint were deeply flawed and lacked meaningful oversight. As a result, they did nothing to ensure that Plaintiff would be able to safely return to FCAT (assuming the retaliation were to be properly addressed) and caused harm by focusing the blame on Plaintiff. They also further eroded her trust in the institution and her feeling of safety in pursuing the kind of research she has set out to do and in which she has invested enormous amounts of time in order to grow in her career and make meaningful and important scientific discoveries and advancements.

146.    Defendants acted in a manner that was willful, wanton, malicious and oppressive, with reckless disregard of or in deliberate indifference to and with the intent to deprive the Plaintiff of her constitutional rights, and did in fact violate the aforementioned rights, entitling

Plaintiff to exemplary and punitive damages in an amount to be proven at the trial in this matter. Plaintiff also seeks attorneys' fees.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### TITLE VII – RETALIATION

**(Against Defendants Tulane University and Board of Tulane)**

147.    Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

148.    Title VII of the Civil Rights Act bars gender discrimination and retaliation for reporting sex discrimination, including sexual harassment that creates a hostile work environment. Civil Rights Act of 1964, § 701 *et seq.*, as amended, 42 U.S.C.A. § 2000e *et seq*.

149.    Title VII, specifically 42 U.S.C. § 2000e-3 makes it unlawful for an employer to retaliate against an employee who has opposed an unlawful employment practice, or a practice they reasonably believed to be unlawful.

150.    Title VII of the Civil Rights Act also protects employees who suffer an adverse employment action because they engaged in a protected activity. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999). Many activities are considered "protected" under Title VII, including but not limited to reporting or opposing harassment. *Carter v. Town of Benton*, 827 F.Supp.2d 700 (W.D. La. 2010).

151.    Plaintiff was employed and compensated as a research assistant by Tulane during portions of her time at FCAT and as a research and teaching assistant while at Tulane. She qualifies as an employee under Title VII.

152.    Plaintiff reasonably believed that the practices she complained of were unlawful, and her reports of sexual harassment and sexual assault while conducting research at FCAT and of Karubian's mishandling of those reports constituted protected activity.

153.    Karubian's action against Plaintiff in response to those reports by Plaintiff constituted unlawful retaliation.

154.    As Plaintiff's supervisor, Karubian acted on behalf of Tulane, and other Tulane officials approved, acceded to, and authorized his actions.

155.    The work restrictions imposed on Plaintiff would not have been implemented but for her reporting the harassment and reporting the mishandling of her report of harassment, as it occurred directly in response to her reporting.

156.    The retaliation against Plaintiff constituted sex discrimination, and gender bias can be inferred from the disregard and minimization by Karubian and others of the underlying assault and the decision to further punish the victim of assault.

157.    Karubian engaged in a series of other adverse conduct toward Plaintiff leading up to the November 30 decision, and such additional conduct constituted retaliation. Such conduct included:

   a.    disregarding Plaintiff's request for discretion and privacy in his handling of the report of the sexual assault;

   b.    insinuating that Plaintiff's time at FCAT during the summer of 2023 would strain their relationship even before the academic year was over;

   c.    strongly encouraging her to find an alternative field site for her research;

   d.    failing to report Plaintiff's accounts of a hostile environment through official FCAT channels;

27

First Amended Complaint for Damages – Jury Demand

e.      instructing Plaintiff not to discuss the matter outside of the discussions with him; and

f.      contacting people whom he knew Plaintiff would turn to for support in order to prejudice them against her.

158.    As a direct and proximate result of the above conduct, Plaintiff sustained damages including, without limitation, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

159.    Defendants acted in a manner that was willful, wanton, malicious and oppressive, with reckless disregard of or in deliberate indifference to and with the intent to deprive the Plaintiff of her constitutional rights, and did in fact violate the aforementioned rights, entitling Plaintiff to exemplary and punitive damages in an amount to be proven at the trial in this matter. Plaintiff also seeks attorneys' fees.

## SECOND CLAIM FOR RELIEF

### TITLE VII – PROMPT AND EQUITABLE INVESTIGATION

### (Against Defendants Tulane University and Board of Tulane)

160.    Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

161.    Defendants failed to ensure a prompt and equitable investigation regarding both the underlying sexual assault Plaintiff reported and the retaliation allegation that the university identified in the course of its investigation into the underlying assault.

162.    Gender bias can be inferred from the procedural flaws in the investigation and hearing processes, including but not limited to:

a.      The lengthy delays in completing the investigations, appeal, and hearing.

b.      The lengthy delays in completing the appeal regarding the sexual assault investigation and hearing in the retaliation investigation, respectively.

c.      Marginalization of the Title IX coordinator in the oversight of the investigations of the assault and retaliation.

d.      The hearing officer's omission of numerous questions submitted by Plaintiff (through her advisor) for the witnesses during the hearing.

163.   Gender bias can also be inferred from the way Defendant Pardee investigated the complaints, including but not limited to the following:

a.      Pardee's manner of questioning Plaintiff, that is, the accusatory questions that shifted the blame to Plaintiff.

b.      Pardee's failure to conduct a follow-up interview with Plaintiff following the interview in which she identified the possible retaliation.

c.      The disclosure of dozens of pages of Plaintiff's private information, which arose in the course of the assault investigation, to Karubian and the hearing panel in the retaliation allegation.

d.      The initial exclusion, via redaction, of relevant statements from Plaintiff and other witnesses.

e.      Analysis in the investigation report regarding the assault that focuses heavily on Plaintiff's credibility and almost entirely omitted any discussion of the respondent's credibility.

f.      Analysis that engaged in victim-blaming and outdated gender stereotypes, e.g., by suggesting Plaintiff's flirtations with the respondent, kissing him, and accompanying him on walks inherently invited him to engage in sexual

intercourse and that her conduct with others and her open relationship with a
romantic partner suggested she was always willing to have sex.

g.      Analysis that inappropriately highlighted the delay in Plaintiff reporting
her assault, suggesting such a delay undermines her credibility.

h.      Mischaracterizing Plaintiff's statements to others about the assault and her
statement to Pardee.

164.    Gender bias can also be inferred from the omission, in the investigation report
regarding the retaliation complaint, of any discussion of information regarding Karubian's
potential motives for or other indications of retaliation, despite Plaintiff's response to the initial
draft report in which she highlighted such information. Such information included:

a.      Plaintiff exposing a long-standing toxic culture at FCAT – a program that
Karubian was deeply invested in and upon which he built much of his academic
reputation – that involved routine sexual harassment of Plaintiff and others. Van
Bael told the investigator that Karubian was upset that Plaintiff was airing "dirty
laundry" about Karubian.

b.      Karubian had a close relationship with Gonzalez, whom Plaintiff was
accusing of sexual assault.

c.      Karubian's mishandling of the assault report, including his months-long
delay in forwarding the report to the university in violation of university policy
and his decision to speak directly with the accused about the allegations even after
he had forwarded the report to the university, violating Plaintiff's privacy and
undermining the integrity of the investigation.

d.      Karubian instructing Plaintiff not to discuss the matter with others.

  e. The haste and timing of the final November 30, 2023 letter that Karubian

sent to Plaintiff, including the fact that he sent it while the university's

investigator was in Ecuador conducting interviews with FCAT staff. Van Bael

flagged this issue, and the investigator ignored it.

  f. Karubian acting on allegations against Plaintiff that should have been

processed through the Title IX process.

165. Gender bias can also be inferred from Defendant Pardee's findings and

conclusions in determining that Defendant Karubian was not responsible for retaliation and that

Gonzalez was not responsible for sexual assault, including but not limited to the following:

  a. The findings were based on inadequate and unbalanced weighing of the

parties' credibility.

  b. The findings were based on assumptions and stereotypes about women's

sexual behavior, including the implications of flirtation and non-sexual romantic

or friendly interactions with men.

  c. The findings did not evaluate all the relevant evidence.

166. Further demonstrating gender bias, the appeal decision regarding the sexual

assault allegation was extremely brief, its findings were almost entirely conclusory in nature, it

included numerous inaccurate statements about the process, and it did not address any of the

specific concerns identified in Plaintiff's appeal (*see* paragraphs 104-106, *supra*).

167. Defendants failed to provide a timely resolution of Plaintiff's appeal of the

outcome of the investigation into the sexual assaults, further demonstrating gender bias.

168. Gender bias can be inferred from the fact that Defendants delayed in disclosing

the contents of the investigation, notifying Plaintiff of her right to appeal, and notifying her of

the outcome of the appeal.

169.    The hearing panel's decision regarding the retaliation complaint was less than three pages long and erroneously found that Plaintiff presented "no evidence" of retaliation and that she suffered no harm as a result of Karubian's actions.

170.    Gender bias can be inferred from the brevity of the hearing panel's decision.

171.    Gender bias can further be inferred from the hearing panel's disregard for all of the evidence Plaintiff offered, during both the investigation and the hearing, that demonstrated retaliation on the part of Karubian (listed under paragraphs 164(a)-(f), *supra*).

172.    The inadequate investigations resulted in Plaintiff being unable to participate in FCAT, as, had the investigations been conducted properly and timely, Plaintiff would have been restored to her work with FCAT.

173.    As a direct and proximate result of the above conduct, Plaintiff sustained damages including, without limitation, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

174.    Defendants acted in a manner that was willful, wanton, malicious and oppressive, with reckless disregard of or in deliberate indifference to and with the intent to deprive the Plaintiff of her constitutional rights, and did in fact violate the aforementioned rights, entitling Plaintiff to exemplary and punitive damages in an amount to be proven at the trial in this matter. Plaintiff also seeks attorneys' fees.

//

//

//

//

**THIRD CLAIM FOR RELIEF**

**TITLE VII – ERRONEOUS OUTCOME**

**(Against Defendants Tulane University and Board of Tulane)**

175.    Plaintiff realleges all prior paragraphs of this complaint and incorporates the same

herein by this reference.

176.    Following Plaintiff's appeal of the investigation of her sexual assault allegations,

Defendant Small rendered a decision that upheld the findings and conclusions of the

investigation that Plaintiff had not experienced sexual assault while in Ecuador.

177.    As a result of Tulane's violation of Title VII, which resulted in an erroneous

outcome, and no sanction, which continues to injure Plaintiff's reputation and right to continue

her future employment, an injunction should issue directing Tulane to reverse the outcome and

findings regarding Plaintiff.

178.    As a direct and proximate result of the above conduct, Plaintiff sustained damages

including, without limitation, loss of educational and career opportunities, reputational damages,

economic injuries and other direct and consequential damages.

179.    Defendants acted in a manner that was willful, wanton, malicious and oppressive,

with reckless disregard of or in deliberate indifference to and with the intent to deprive the

Plaintiff of her constitutional rights, and did in fact violate the aforementioned rights, entitling

Plaintiff to exemplary and punitive damages in an amount to be proven at the trial in this matter.

Plaintiff also seeks attorneys' fees.

//

//

//

First Amended Complaint for Damages – Jury Demand

## FOURTH CLAIM FOR RELIEF

### TITLE IX – RETALIATION

### (Against Defendants Tulane University and Board of Tulane)

180.     Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

181.     Title IX of the Education Amendments of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

182.     Title IX of the Education Amendments of 1972 applies to all private educational institutions that receive federal funding, including Defendant Tulane.

183.     Tulane receives federal funding, including in the form of federal student loans given to students and is thus subject to the provisions of Title IX.

184.     Title IX is enforceable through a private right of action. See *Overdam v. Texas A&M Univ.*, 43 F.4th 522, 527 (5th Cir. 2022).

185.     The federal regulations provide:

> No recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by title IX or this part, *or because the individual has made a report* or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part. . . . *The recipient must keep confidential* the identity of any individual who has made a report or complaint of sex discrimination, including any individual who has made a report or filed a formal complaint of sexual harassment, any complainant, any individual who has been reported to be the perpetrator of sex discrimination, any respondent, and any witness . . . .

34 C.F.R. § 106.71(a) (emphasis added).

186.     Plaintiff reasonably believed that the practices she complained of were unlawful, and her reports of sexual harassment and sexual assault while conducting research at FCAT and of Karubian's mishandling of those reports constituted protected activity. Karubian's action against Plaintiff in response to those reports by Plaintiff were taken on behalf of, and with the approval and authorization of, Tulane and constituted unlawful retaliation.

187.     The work and educational restrictions imposed on Plaintiff would not have been implemented but for her reporting the harassment and reporting the mishandling of her report of harassment, as it occurred directly in response to her reporting.

188.     The retaliation against Plaintiff constituted sex discrimination, and gender bias can be inferred from the disregard and minimization by Karubian and others of the underlying assault and the decision to further punish the victim of assault.

189.     Karubian engaged in a series of other adverse conduct toward Plaintiff leading up to the November 30 decision (*see* paragraphs 157(a)-(f), *supra*), and such additional conduct constituted retaliation.

190.     Title IX also requires the provision of supportive measures to the parties. 34 C.F.R. § 106.44. Defendants failed to provide any supportive measures to Plaintiff.

191.     As a direct and proximate result of the above conduct, Plaintiff sustained damages including, without limitation, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

### FIFTH CLAIM FOR RELIEF

### TITLE IX – FAILURE TO INVESTIGATE AND TAKE CORRECTIVE ACTION

### (Against Defendants Tulane University and Board of Tulane)

192.     Plaintiff realleges all prior paragraphs of this complaint and incorporates the same

herein by this reference.

193.    Defendants failed to ensure a prompt and equitable investigation regarding the retaliation allegation that the university identified in the course of its investigation into the underlying assault.

194.    "A recipient must adopt and publish grievance procedures that provide for the prompt and equitable resolution of student and employee complaints alleging any action that would be prohibited by this part." 34 C.F.R. § 106.8(c). Such grievance procedures apply to allegations of retaliation. 34 C.F.R. § 106.71(a)

195.    "Each recipient must designate and authorize at least one employee to coordinate its efforts to comply with its responsibilities under this part." 34 C.F.R. § 106.8(a). The coordinator is therefore responsible for coordinating the university's response to retaliation allegations. *See* 34 C.F.R. § 106.71(a).

196.    The investigation did not properly involve coordination or oversight by the Title IX coordinator.

197.    Title IX requires that the grievance process "[i]nclude reasonably prompt time frames for conclusion of the grievance process." 34 CFR § 106.45(b)(1)(v).

198.    The investigation was not conducted promptly.

199.    The Title IX regulations require that the grievance process "[r]equire that any individual designated by a recipient as a Title IX . . . investigator . . . not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent." 34 CFR § 106.45(b)(1)(iii); *see also* 34 CFR § 106.45(b)(1)(ii) (requiring that the grievance process "[r]equire an objective evaluation of all relevant evidence—including both inculpatory and exculpatory evidence— and provide that credibility determinations may not be

based on a person's status as a complainant, respondent, or witness").

200.    Plaintiff was denied an investigation free from bias or conflict of interest on the

part of the investigator.

201.    Plaintiff was denied an objective evaluation of the evidence, including credibility

determinations that were not based on Plaintiff's status.

202.    Title IX further requires that the grievance process "[p]rovide an equal

opportunity for the parties to present witnesses, including fact and expert witnesses, and other

inculpatory and exculpatory evidence." 34 CFR § 106.45(b)(5)(ii).

203.    Plaintiff was denied an equal opportunity to present evidence, as her credibility

was questioned extensively while the credibility of the respondent, Karubian, was hardly

questioned at all, and the investigator and hearing panel disregarded evidence presented by

Plaintiff.

204.    Gender bias can be inferred from the procedural flaws in the process related to the

investigation of the allegation of retaliation, including but not limited to:

    a.    The lengthy delay in completing the investigation.

    b.    The lengthy delay in completing the hearing following the investigation.

    c.    Marginalization of the Title IX coordinator in the oversight of the

    investigation of the allegation of retaliation.

    d.    The hearing officer's exclusion of important questions that Plaintiff

    submitted (through her advisor) during the hearing.

    e.    The lengthy delay in rendering the final decision following the hearing.

205.    Gender bias can also be inferred from the way Defendant Pardee investigated the

complaints, including but not limited to the following:

First Amended Complaint for Damages – Jury Demand

a.    Pardee's manner of questioning Plaintiff, that is, the accusatory questions that shifted the blame to Plaintiff.

b.    Pardee's failure to conduct a follow-up interview with Plaintiff following the interview in which she identified the possible retaliation.

c.    The disclosure of dozens of pages of Plaintiff's private information to Karubian and the hearing panel.

d.    The exclusion, via redaction, of relevant statements from Plaintiff and other witnesses.

e.    The omission in the investigation report of any discussion of Karubian's potential motives for, and other indications of, retaliation (*see* paragraphs 164(a)-(f), *supra*).

f.    Conduct in the investigation of the underlying assault allegation, including analysis in the investigation report regarding the assault that focused heavily on Plaintiff's credibility and almost entirely omitted any discussion of the respondent's credibility; analysis that engaged in victim-blaming, e.g., by suggesting Plaintiff's flirtations with the respondent, kissing him, and accompanying him on walks inherently invited him to engage in sexual intercourse and that her conduct with others and her open relationship with a romantic partner suggested she was always willing to have sex; analysis that inappropriately highlighted the delay in Plaintiff reporting her assault; mischaracterizing Plaintiff's statements to others about the assault and her statement to Pardee; and the erroneous outcome of that investigation.

206.    Gender bias can also be inferred from Defendant Pardee's findings and

First Amended Complaint for Damages – Jury Demand

conclusions in both investigations (retaliation and the underlying assault), including by basing those findings on inadequate and unbalanced weighing of the parties' credibility; assumptions and stereotypes about women's sexual behaviors; and a failure to evaluate all the relevant evidence.

207.    Gender bias can also be inferred from the brevity of the hearing panel's decision, the panel's erroneous finding that Plaintiff presented no evidence of retaliation (*see* paragraphs 164(a)-(f), *supra*), and the panel's erroneous finding that Karubian's actions did not cause Plaintiff any harm.

208.    The inadequate investigation resulted in Plaintiff being unable to participate in FCAT, as had the investigations been conducted properly and timely, Plaintiff would have been restored to her work with FCAT.

209.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to exonerate the respondent for retaliating against a complainant alleging serious sexual misconduct by a male.

210.    As a direct and proximate result of the above conduct, Plaintiff sustained damages including, without limitation, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

## <u>SIXTH CLAIM FOR RELIEF</u>

### State Employment Discrimination Law – Retaliation and Sex Discrimination

### (Against Defendants Tulane and Board of Tulane)

211.    Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

212.    La. R.S. 23:332(A)(1) makes it unlawful to discriminate against any individual in employment based on their sex.

213.    The Louisiana anti-discrimination law shares a similar scope and applicability to its federal counterparts pled herein. *White v. Golden*, 982 So.2d 234, 243 (La. App. 2008).

214.    Defendants' actions constituted unlawful retaliation and sex discrimination as demonstrated by a failure to conduct prompt and equitable investigations into the sexual assault of Plaintiff, retaliation against her, and an erroneous outcome on the same bases described herein, *supra*.

215.    As a direct and proximate result of the above conduct, Plaintiff sustained damages including, without limitation, loss of educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

## SEVENTH CLAIM FOR RELIEF

### Negligent Supervision, Training and Staffing

### (Against Defendants Tulane, Board of Tulane, Small, Smith, Foster, and Woodley)

216.    Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

217.    Defendants had a duty to properly supervise, train, and monitor their employees and students and to ensure those employees' and students' compliance with all applicable statutes, laws, regulations, and institutional policies, but they failed to do so and therefore breached the duties of care owed to Plaintiff as alleged herein. Each of these duties to supervise, train, and monitor included the duty to ensure that the Equal Opportunity, Title IX, and other relevant policies were followed to prevent, properly respond to, and remedy incidents of sex-based discrimination and retaliation.

218.    Defendant Board of Tulane had a duty to supervise, train, and monitor the actions of Defendant Tulane. Defendant Tulane had a duty to supervise, train, and monitor the actions of Smith, Foster, and Woodley, as well as Van Bael and Frank.

219.    Defendants improperly, negligently, wrongfully, and recklessly failed to supervise and train their subordinates to ensure that their subordinates did not violate Plaintiff's rights.

220.    Defendant Tulane failed to ensure that Defendants Smith and Foster had the proper training and supervision to properly oversee and coordinate the response to Plaintiff's reports of sexual assault and retaliation.

221.    Defendant Small failed to intervene in his role as the appeal officer to reverse the outcome of the investigation and correct the failures by Defendant Smith, his subordinate, regarding the sexual assault investigation.

222.    Defendants Smith and Foster failed to ensure that Defendant Pardee received the supervision necessary to conduct a fair, unbiased, and thorough investigation into the sexual assault allegations and the retaliation allegation. They failed to intervene when Pardee submitted draft reports that contained numerous critical omissions and content constituting victim-blaming, shaming, and engaging in outdated stereotypes about women and sexual conduct, knowing that Plaintiff would view that content.

223.    Defendant DOES failed to ensure the faculty hearing panel received adequate supervision to properly conduct the hearing regarding the retaliation complaint.

224.    Defendant Woodley failed to adequately intervene in the retaliation against Plaintiff after Plaintiff made her aware of it.

225.    By engaging in the acts alleged herein, all Defendants failed to act with ordinary care and breached their duty of care owed to Plaintiff.

226.    As a direct and proximate result of the above conduct, Plaintiff sustained damages including, without limitation, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

## EIGHTH CLAIM FOR RELIEF

### Negligence and Negligent Infliction of Emotional Distress

### (Against All Defendants)

227.    Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

228.    Under duty-risk analysis for determining liability, a plaintiff must prove (1) the conduct in question was the cause-in-fact of the resulting harm; (2) the defendant owed a duty of care to plaintiff; (3) the requisite duty was breached by the defendant; and (4) the risk of harm was within the scope of protection afforded by the duty breached. *Stroik v. Ponseti*, 699 So.2d 1072, 1078 (La. 1997).

229.    Defendants' actions were the cause-in-fact of Plaintiff's injury and emotional distress, and the risk of injuring Plaintiff was within the scope of duty that was breached by Defendants' decision to retaliate against Plaintiff or to conduct or permit flawed investigations and disciplinary processes that resulted in Plaintiff's exclusion from critical aspects of her work and education while at Tulane.

230.    Defendant Karubian terminated Plaintiff from his advisory and the FCAT program without adhering to the required procedures and failed to forward her report of assault to the Title IX office promptly, despite his duties, enumerated in Tulane's policies and implicit in his role as her advisor and supervisor, to ensure she is treated fairly, provided appropriate process, and protected from ongoing discrimination or retaliation.

231.    Defendants Smith and Foster failed to ensure that Pardee received the supervision necessary to conduct a fair, unbiased, and thorough investigation into the sexual assault allegations and the retaliation allegation. They failed to intervene when Pardee submitted draft reports that contained numerous critical omissions and content constituting victim-blaming, shaming, and engaging in outdated stereotypes about women and sexual conduct, knowing that Plaintiff would view that content.

232.    Defendant Small failed to properly review the investigation of the sexual assaults when it was appealed to him as the appeal officer, despite having a duty to do so under Tulane policies and in his role as an administrator with oversight over the process.

233.    As university administrators whose duties included supervising the anti-discrimination efforts of the university, Defendants Small, Smith, and Foster had a duty to protect Plaintiff from discrimination or retaliation, address any allegations of such conduct through the processes provided for in Tulane's policies, and review the work of others, including Defendant Pardee, related to such efforts.

234.    Defendant Woodley failed to adequately intervene in the retaliation after Plaintiff made her aware of it. As a high-level administrator, Defendant Woodley had a duty to report any ongoing retaliation or discrimination and take measures to intervene in any such potential misconduct.

235.    Defendant Pardee failed to conduct fair, unbiased, and thorough investigations into the allegations of sexual assault and retaliation against Plaintiff. As a neutral investigator operating at the behest of and under the auspices of Tulane, Defendant Pardee had a duty to ensure a neutral and fair investigation and to treat a potential victim with dignity.

236.    Defendants Small, Foster, and Smith, along with other Tulane personnel, failed to

fulfill their duty to ensure a fair hearing regarding the retaliation complaint.

237.     Tulane University and Board of Tulane were vicariously liable for the acts of the individual Defendants in their employ and independently negligent for failing to adequately train and supervise their employees and investigators.

238.     By engaging in the acts alleged herein, all Defendants failed to act with ordinary care and breached their duty of care owed to Plaintiff.

239.     As a direct and proximate result of the above conduct, Plaintiff sustained damages including, without limitation, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

240.     Defendants' conduct was extreme and outrageous; knowing that the emotional distress suffered by Plaintiff was severe and ongoing; and Defendants desired or acted with recklessness to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from their conduct.

241.     Defendants' decision to retaliate against Plaintiff and to conduct or permit flawed investigations and disciplinary processes that resulted in Plaintiff's exclusion from critical aspects of her work and education while at Tulane, was substantially certain to result in harm.

## NINTH CLAIM FOR RELIEF

### Respondeat Superior

### (Against Defendants Tulane University and Board of Tulane)

242.     Plaintiff realleges and incorporates each and every foregoing paragraph.

243.     At all times material, Defendants Karubian, Small, Smith, Foster, and Woodley were on the premises of Tulane and privileged to be on the premises by virtue of their employment with Tulane. Defendant Pardee was contracted to provide services on behalf of

Tulane. When they took the prohibited actions against Plaintiff, they were employees and/or agents of Defendants Tulane and Board of Tulane within the scope of their employment.

244.    Defendants Tulane and Board of Tulane are therefore liable for all torts committed by their agents, including in this case Van Bael, Frank, and Defendants Karubian, Small, Smith, Foster, Woodley, and Pardee, and damages resulting therefrom.

## TENTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress

### (Against All Defendants)

245.    Plaintiff realleges and incorporates each and every foregoing paragraph.

246.    Plaintiff alleges intentional infliction of emotional distress by all Defendants in their response to reports of sexual misconduct and/or retaliation.

247.    By delaying reporting Plaintiff's report of sexual assault, retaliating against Plaintiff or allowing such retaliation for making reports of sexual assault and mishandling of her report, conducting or allowing biased and inadequate investigations into Plaintiff's reports of assault and retaliation, terminating or allowing the termination of Plaintiff from FCAT and her advisory without following proper procedures to ensure fairness, Defendants engaged in extreme and outrageous conduct. Defendants specifically intended for their conduct to cause Plaintiff to suffer emotional distress so severe that it would silence any additional disclosures.

248.    As a direct and proximate result of the above conduct, Plaintiff sustained damages including, without limitation, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

//

//

## ELEVENTH CLAIM FOR RELIEF

### Breach of Contract

### (Against Defendants Tulane University and Board of Tulane)

249.    Plaintiff realleges and incorporates each and every foregoing paragraph.

250.    Every contract in Louisiana carries an implied covenant of good faith and fair dealing. *Grisaffi v. Dillard Dep't Stores, Inc.*, 43 F.3d 982, 983 (5th Cir. 1995).

251.    Defendants failed to act in good faith and fair dealing with regards to Plaintiff's employment and enrollment contracts when they terminated her.

### A.  Reporting obligations

252.    Defendant Tulane's Equal Opportunity/Anti-Discrimination Policy ("EO Policy") provides that "[e]mployees should report allegations of possible discrimination, harassment, and/or retaliation upon receiving a specific complaint or report alleging improper activity." Under the EO Policy, employees should report such incidents "[w]ithin 24 hours, (or as soon as possible) after facts or allegations of possible harassment, discrimination, and/or retaliation are disclosed." Under the policy, "[a]ll staff and faculty must report alleged violations specific to Title IX." Under the EO Policy, when reporting, "[e]mployees have a responsibility to report to the University all relevant details (obtained directly or indirectly) about an incident of discrimination, harassment, and/or retaliation that is made known to them and involves a Student, Staff Member, Faculty Member, or Third-Party affiliated with Tulane. Employees include Staff, Administrators, [and] Faculty . . . ."

253.    Defendant Karubian failed to timely report acts of discrimination against Plaintiff; such failure constituted a breach of contract.

254.    Woodley, Van Bael, and Frank failed to report acts of retaliation by Karubian against Plaintiff; such failures constituted a breach of contract.

255.    Under the EO Policy, "Supervisors or Managers must report allegations of possible discrimination, harassment, and/or retaliation upon receiving a specific complaint or report alleging a violation of this policy. This includes . . . Discrimination, harassment, and/or retaliation . . . against a person under someone's supervisory authority."

256.    As Plaintiff's manager, Karubian had an obligation to timely report her report of sexual assault, and he failed to do so. His failure constitutes a breach by Defendants of the contract with Plaintiff.

257.    Under the EO Policy:

Employees who fail to cooperate or timely report all relevant details (obtained directly or indirectly) about an incident of prohibited conduct that is made known to them about a matter covered by this policy will be considered to have breached their responsibility to the University. The Department Head, Supervisor, or Dean with supervisory authority over a non-cooperative employee will be notified of such non-cooperation so appropriate action may be taken.

EO Policy at 11.

258.    Defendants took no action against those employees who failed to report the retaliation against Plaintiff and has taken no action against Karubian for his untimely reporting of the sexual assault. Such failure by Defendants constitutes a breach of their contract with Plaintiff.

**B. Retaliation**

259.    Tulane's Equal Opportunity Policy provides:

Tulane prohibits discrimination in its employment practices or educational programs/activities on the basis of age, color, disability, gender expression, gender identity, genetic information, marital status, military status, national origin, pregnancy, race, religion, sex, sexual orientation, or veteran status, or any other status or classification protected by federal, state, or local law. Tulane complies with applicable federal and state laws addressing discrimination, harassment, and/or retaliation. Discrimination or harassment on the basis of any

protected status or classification, by anyone affiliated with Tulane, whether verbal, physical, written, or visual, is unacceptable and will not be tolerated. . . . University faculty (including visiting faculty), staff, students, and volunteers shall abide by this policy.

260.    Defendants' acts of retaliation violate this provision of the policy prohibiting retaliation and discrimination based on sex.

261.    Tulane's Policy Against Retaliation prohibits retaliation for "[t]he disclosure of information concerning conduct that the reporter believes is illegal or in violation of university policies," "[t]he good faith provision of information or testimony to, or the filing of a complaint initiating proceedings before, a duly constituted investigatory body of the university," and "[t]he filing of a good faith complaint or incident report."

262.    Defendants' retaliation against Plaintiff by terminating her from her advisory with Karubian and by terminating her participation in FCAT constituted a violation of this policy and therefore a breach of their contract with Plaintiff.

263.    These actions by Tulane officials were taken in response to (1) Plaintiff's "disclosure of information" she "believe[d] [was] illegal or in violation of university policies," namely, information about the sexual assault in Ecuador and Jordan Karubian's mishandling of her report; (2) Plaintiff's "good faith provision of information to . . . a duly constituted investigatory body of the university," namely, her report of the sexual assault to Tulane's Title IX office, which is tasked with investigating such complaints; and (3) Plaintiff's "filing of a good faith complaint or incident report" to the Title IX office. These actions therefore constituted retaliation and a breach of contract.

264.    The EO Policy provides:

Retaliation is action or words intentionally taken against an individual because of the individual's participation in a protected activity such as reporting discrimination, harassment, and/or retaliation. Protected activity includes an

individual's good faith: (1) participation in the reporting, investigation, or resolution of an alleged violation of this Policy, including Title IX allegations; (2) opposition to policies, practices, or conduct the individual reasonably believes are in violation of this Policy. . . . Examples of prohibited retaliatory conduct include: (1) disciplining, changing working or educational conditions when not related to job performance, misconduct, or other legitimate business reasons. . . . The initiation of a good faith complaint of discrimination, harassment, and/or retaliation by an individual will not reflect negatively on that individual nor will it affect the individual's academic standing, working conditions, rights, or privileges.

EO Policy at 8.

265.    Plaintiff's report of sexual assault and her report of Karubian's mishandling of her report of sexual assault were protected activity under the policy.

266.    Plaintiff's termination from participation in FCAT and her advisory constituted "disciplin[e], [a] chang[e] [in] working or educational conditions" under the policy and affected her "academic standing, working conditions, rights, [and] privileges."

267.    Karubian claimed that the termination was based on Plaintiff's "job performance, misconduct, or other legitimate business reasons," but these were pretexts for retaliatory purposes.

### C. Investigations and hearing

268.    The EO Policy provides for an expeditious investigation:

Investigations will commence as soon as practicable following the Initial Inquiry process detailed above. Investigations will be conducted as expeditiously as possible and are usually completed within a reasonable period, typically 60 days, though this may vary based on the availability of parties and witnesses, breaks in the academic calendar, scope of the investigation, or unforeseen or exigent circumstances. If additional time is needed to conduct a thorough investigation, the Office of Institutional Equity may, at its discretion, extend the time for completing the investigation as reasonably necessary. The Office of Institutional Equity will notify the Complainant and Respondent of any extensions. The Complainant, Respondent, and appropriate supervisors will receive regular updates on the status of the investigation.

EO Policy at 12.

First Amended Complaint for Damages – Jury Demand

269.    Plaintiff was not provided with notices as to extensions, despite the investigations taking considerably longer.

270.    This excessive duration and lack of updates constituted violations of the policy and a breach of contract.

271.    The investigations lacked the neutrality and fairness provided for in university policy. *See* EO Policy at 42.

272.    The investigations included prejudicial and irrelevant evidence regarding Plaintiff's dating and sexual history, in violation of the EO Policy. *See* EO Policy at 42-43.

273.    Under the University's <u>Faculty Handbook</u>, a panel of faculty, Faculty Handbook at 74, convene to hold a hearing, and the panel determines which questions, submitted in writing by the parties, to pose to the parties and witnesses, Faculty Handbook at 75.

274.    Defendants' conduct of the hearing regarding the retaliation complaint did not comport with the policy requiring that each party have an equal opportunity to propose questions for witnesses. *See* Faculty Handbook at 75; EO Policy at 43. Plaintiff was denied the opportunity to ask numerous questions regarding witness credibility.

275.    After the hearing, the University has twenty business days to notify the parties of the outcome. Faculty Handbook at 75. Notice of the outcome took significantly longer than this.

276.    "Title IX also prohibits retaliation for asserting claims of sex discrimination. Tulane University has designated Title IX Coordinators, to coordinate Tulane's compliance with and response to inquiries concerning Title IX." Faculty Handbook at 53-54.

277.    Despite this policy, the Title IX coordinator played only a very limited role in ensuring integrity of the investigation and hearing process.

//

### D. Discipline process regarding allegations against Plaintiff

278.    The EO Policy provides that "[c]omplaints against students will be processed in accordance with Tulane's Code of Student Conduct." EO Policy at 5.

279.    Defendants' failure to process the allegations that Plaintiff engaged in conduct at FCAT that, if true, would constitute sexual harassment deprived her of the process provided for under the contract between Defendants and Plaintiff. Plaintiff was subjected to discipline – termination from her advisory and from participation in FCAT – without being afforded the process provided for under the policy.

280.    The EO Policy and **Student code of conduct** ("Code of Conduct") provide numerous procedural protections that Plaintiff was deprived of with respect to the allegations against her; her own complaints also were not addressed properly under the policy. Under the EO Policy, "[t]he Complainant and Respondent are entitled to an investigation conducted by an impartial investigator." EO Policy at 11. Defendant Pardee was not impartial in her investigations of Plaintiff's allegations against Gonzalez and Karubian.

281.    Under the Student Code of Conduct:

- "Any student involved in any conduct process begins with no presumptions of wrongdoing." (pages 7-8)

- "Tulane University uses an investigative procedure administered by trained professionals, subject to substantial review and specified rights to appeal." (page 8)

- "The mere fact that a situation is being referred for investigation does not indicate any determination of transgression of any kind. The investigation process is exactly that—a neutral and fair investigation with no presumptions of wrongdoing. It will be up to the

investigator/adjudicator and/or decision maker to make determinations regarding any potential transgressions subject to review and rights to appeal." (Page 8)

- "The conduct officer will review with the student relevant initiating information such as an incident report or other information that may support a determination that a transgression of the Tulane University Code has occurred, so as to offer the student the opportunity to respond and to present relevant witnesses or information."

- "The conduct officer has the discretion to consider what, if any, relevant witnesses or information may be introduced, including the discretion to seek additional information not provided initially or by the student."

- "The conduct officer also has the discretion to determine the weight and sufficiency of the information, and is charged with assessing the credibility of witnesses, if appropriate to do so, in making a determination."

- "After reviewing all of the evidence, the conduct officer will make a determination regarding whether any transgression of rules has occurred, and if applicable, appropriate consequences."

282.    Plaintiff was deprived of all of these procedural protections because Karubian issued the discipline and changed Plaintiff's work and educational conditions without bringing his concerns to the Title IX office or other offices, and her termination thus constituted a breach of contract.

283.    Far from a neutral investigation, Defendants instead permitted a biased party, Karubian, to make sweeping decisions about Plaintiff's university career and work and academic opportunities. No review of evidence occurred.

284.    The Code of Conduct further provides:

When the gatekeepers have determined that the investigation process should be utilized for individual students or for organizations, the matter will be referred to an investigator by the Director of Student Conduct. . . . During the Procedural Review, students will learn about the conduct investigation process in detail, including all rights, privileges, and responsibilities. Students will also learn about the variety of supportive resources in place to help students navigate this process. Students will also learn details about communication and timeline. Students will receive a written summary of the meeting for their reference. An advisor may also join students in this meeting. The Director or the investigator will issue a notice of investigation to necessary parties/persons, including the respondent/s and complainant/s . . . . The investigator will direct the investigation. . . . [A]ll investigators are trained in trauma-informed care. The investigation is designed to provide a fair and reliable gathering of the facts by a trained and impartial investigator, who will determine consequences, if any. All individuals, including witnesses, will be treated with appropriate sensitivity and respect throughout the investigation. When possible, the investigation will safeguard the privacy of the individuals involved in a manner consistent with applicable law and the Tulane Code. During the investigation, the investigator will provide the individuals a fair and equal opportunity to be heard, opportunities to submit information, and to identify witnesses who may have relevant information. The investigator may speak separately with individuals who are willing to participate and have information relevant to the determination of responsibility. As part of the investigation, the investigator may gather or receive information that is relevant to the determination of appropriate consequences, including information about any impacts on any member of the Tulane community. The investigator will also gather available physical or documentary evidence, including prior statements, any relevant communications, email messages, social media materials, text messages, and other records as appropriate and available.

Code of Conduct at 12-13.

285.    Plaintiff received none of this process. Instead, Karubian terminated her for retaliatory reasons and did not follow the required procedures.

286.    Van Bael and Frank acquiesced in the termination that violated these procedures.

287.    Rather than a neutral fact-finder, Karubian decided Plaintiff's fate without the benefit of any investigation, expertise, training, or process.

288.    Plaintiff was provided no information about her rights or resources available to her.

First Amended Complaint for Damages – Jury Demand

289.    She was not given notice or an opportunity to be heard or to present

witnesses.

290.    Trauma-informed practices played no role whatsoever.

291.    The Code of Conduct, at 14-15, further provides:

At the conclusion of the investigation, the investigator will prepare a written
report that summarizes the information gathered, synthesizes the areas of
agreement and disagreement among or between individuals and/or organizations
with any supporting information or accounts, and includes an investigative
finding regarding whether any rule has been violated. However, before the report
is finalized, necessary individuals and/or organizations will be given the
opportunity to review a draft of the investigation report for ten (10) business days,
which may be presented in redacted format to protect the privacy rights of
individuals involved in the investigation.

Upon receipt of any additional information from individuals and/or organizations
involved in the process, or after the ten (10) business day comment period has
lapsed without comment, the investigator will make a final investigative
determination, by a preponderance of the evidence, regarding whether a rule
transgression has occurred and will recommend consequences, if any. . . .

The Complainant and Respondent will be provided the opportunity to submit a
written Impact Statement. These written Impact Statements will not be considered
in the determination of responsibility, but will be provided to the investigator, and
at the appropriate stage of the process, to the disciplinary authority or Hearing
Panel for consideration in the determination of the sanction and remedy.

292.    None of these protections were afforded to Plaintiff because Karubian, with the

acquiescence of others, short-circuited and skipped over the required process and instead

unilaterally imposed severe discipline on Plaintiff.

293.    Plaintiff would have had, but was instead denied, the opportunity to seek

alternative discipline, rather than the severe consequences she suffered:

In determining the appropriate consequences, the investigator shall consider the
following factors:

- The nature of any behavior, including violence;

- The impact of behavior on other individuals or groups;

- The impact or implications of the behavior on the community
  or the University;

- Prior transgressions, both at the University or elsewhere, including
  criminal convictions;

- Whether a student . . . has accepted responsibility for the conduct;

- Maintenance of a safe and respectful environment conducive to learning;

- Protection of the University community;

- Any applicable professional standards of behavior; and,

- Any other mitigating, aggravating, or compelling circumstances to reach a
  just and appropriate resolution in each matter.

Code of Conduct at 15.

294.    Plaintiff would have received extensive appeals procedure regarding the

allegations against her. Code of Conduct at 20-22. She received no such opportunity.

295.    Under Louisiana law, the basic legal relation between a student and a private

university is contractual in nature and the publications given to the student are part of the terms

of that contract. *See I.F. v. Administrators of the Tulane Educ. Fund*, 131 So. 3d 491, 498 (2013).

296.    The disciplinary decisions of a private university may be reviewed for arbitrary

and capricious action because the power of private institutions is not absolute and they may not

cavalierly disregard or ignore the due process safeguards set forth in their own policies. *See I.F.,*

31 So. 3d at 499. A private university's failure to adhere to its own binding procedures can make

a resulting decision arbitrary and capricious. *Id.*

297.    Tulane acted in bad faith, thereby breaching the covenant of good faith and fair

dealing implied in its contract with Plaintiff, by materially deviating from its conduct process,

following unwritten rules and applying inapplicable policies, to Plaintiff's detriment.

298.    Tulane's findings of responsibility and decision to suspend Plaintiff were arbitrary and capricious because Tulane failed to follow its own binding procedures, substantially and materially deviated from its procedures such that it was difficult for Plaintiff to discern precisely which procedures were being applied to his student conduct process, and Tulane's decisions were made in disregard of the evidence or the proper weight thereof.

299.    The causes and objects of these obligations include obtaining an education, and the privileges of attending the institution of Tulane, Plaintiff paying tuition, fees, and costs. Defendants accepted Plaintiff's consideration and obtained the benefit of the Defendants' bargain, and Plaintiff performed.

300.    Defendants breached their contractual obligations to Plaintiff by failing to provide Plaintiff with an education free from sex-based discrimination and retaliation, and by terminating her participation in a key part of her education without a proper investigation and process, as provided for in Tulane's policies. Defendants' failure to provide Plaintiff with her contractually owed benefits is a material failure to perform that included nonperformance, defective performance, and delay in performance.

301.    Defendants' material failure to perform (breach) resulted in economic and emotional damages to the Plaintiff.

302.    Defendants' failure to perform was in bad faith as alleged herein, and thus Plaintiff is entitled to all damages regardless of foreseeability. LA. CIV. CODE art. 1997. These damages include damages for nonpecuniary loss as the nature of these specific obligations is intended to gratify a nonpecuniary interest. Because of the circumstances surrounding the formation and the nonperformance of the obligations, Defendants knew, or should have known, that their failure to perform would cause substantial nonpecuniary loss to Plaintiff. Additionally,

Defendants intended to cause nonpecuniary damages, as alleged herein; thus, these damages may be recovered. LA. CIV. CODE art. 1998.

303.    As a direct and proximate result of Defendants' failure to perform, Plaintiff has sustained injuries and damages, including, but not limited to, expenses associated with mental health treatment, inconvenience, insult, mental distress, humiliation, anxiety, emotional pain and suffering, a denial of access to educational opportunities and benefits, and other economic or non-economic damages.

304.    Plaintiff is entitled to monetary compensation for pecuniary and nonpecuniary damages and injunctive relief requiring specific performance from Defendants. *See* LA. CIV. CODE art. 1986.

## TWELFTH CLAIM FOR RELIEF

### Whistleblower Law

305.    Louisiana Law prohibits "reprisal" against any employee who "discloses or threatens to disclose a workplace act or practice that is in violation of state law" after "advising the employer of the violation of the law." R.S. 23:967.

306.    Here, Plaintiff disclosed workplace acts and practices that violated the Louisiana Employment Discrimination Law.

307.    Plaintiff was subject to reprisal and punishment for reporting those violations of law.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows against defendants:

1.  For a declaration that Tulane, the Board of Tulane, and individual defendants violated Plaintiff's rights under Title VII and Title IX.

2. For an appropriately tailored injunction, after discovery (if necessary) into the current practices of Tulane and Board of Tulane, requiring that Tulane and Board of Tulane institute practices and procedures to comply with Title IX and Title VII to ensure Plaintiff and other students and employees of Tulane receive protection from sex discrimination and retaliation. Plaintiff respectfully requests that such injunctive relief include (but not be limited to) the following:

    a. Appropriate changes to policies, procedures, training, and supervision regarding the responsibilities of faculty, advisors, the Office of Institutional Equity, and the Title IX office as to reporting, responding to, and investigating such incidents.

    b. Structural changes to the Title IX process to ensure that the Title IX coordinator operates with independence and authority to directly coordinate investigations, including the hiring/contracting of investigators.

    c. Ongoing monitoring of Tulane's relevant practices and procedures for however many years necessary, under a consent decree or the equivalent, to ensure practices and procedures compliant with the law are implemented and maintained.

3. For compensatory, general, and special damages, in an amount according to proof;

4. For general damages, including damages for emotional pain, emotional distress, hardship, suffering, shock, worry, anxiety, sleeplessness, illness and trauma and suffering;

5. For prejudgment interest;

6. For exemplary and punitive damages against each individual and Doe defendant, in

amounts according to proof and appropriate to punish defendants and deter others

from engaging in similar misconduct;

7.  For costs of suit, including reasonable attorneys' fees, under 42 U.S.C. § 1988; and

8.  For such other relief as may be warranted or as is just and proper.

## X.    DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury in this action.

Dated this 18th day of February, 2025.

**MOST AND ASSOCIATES**

/s/ Hope Phelps
_____
Hope Phelps
Attorney for Plaintiff,
JUDITH SANTANO

**LAW OFFICE OF AARON ZISSER**

_____
Aaron B. Zisser
Attorney for Plaintiff (*pro hac vice*),
JUDITH SANTANO