

# The Tulane University Code of Student Conduct

Office of Student Conduct
Division of Student Affairs
2023-2024



# Table of Contents

I. PREAMBLE AND THE CORE VALUES .................................................................. 4

II. SCOPE OF THE CODE ...................................................................................... 5

III. COMMUNICATION, AND RESPECTFUL AND MEANINGFUL PARTICIPATION ........ 6

IV. TIMEFRAMES .............................................................................................. 6

V. ADVISORS .................................................................................................... 7

VI. PROCESS ..................................................................................................... 7

    A.  Gatekeepers ........................................................................................... 8

    B. Educational Conferences/Organizational Partnership Process ..................... 9

    C. Administrative Hearing ........................................................................... 10

    D. Student Hearing Panel (Organizations Only).............................................. 11

    E. Investigation of Major Matters (non-Title IX).............................................. 12

    F. Title IX "Sexual Harassment" Grievance Procedures (Title IX) ...................... 17

    G. Alternative Resolution Options ............................................................... 19

    H. Appeals ............................................................................................... 20

VII. RULES ....................................................................................................... 22

    A. General Misconduct .............................................................................. 22

VIII. RESPONSES AND CONSEQUENCES ............................................................. 30

    A. Consequences ...................................................................................... 30

    B. Other Responses .................................................................................. 32

IX. RELATED POLICIES AND PRACTICES .............................................................. 34

X. AMNESTY PROVISIONS ................................................................................. 34

XI. PRIVACY, CONFIDENTIALITY, TRANSPARENCY, REPORTING AND RECORD-KEEPING ........ 34

XII. NOTICE OF EQUAL OPPORTUNITY AND ANTI-DISCRIMINATION ..................... 36

XIII. EXTERNAL AGREEMENTS/DEFERENCE TO EXTERNAL LEGAL AUTHORITIES ..... 38

XIV. INTERPRETATION OF THE CODE ................................................................. 38

*XV. REVISION OF CODE\** ...................................................................................................... *39*

*XVI. THE IMPORTANT ROLE OF FAMILIES* ........................................................................ *40*

*XVII. NOTIFICATION OF ARREST* ........................................................................................ *41*

*Appendix A:* .............................................................................................................................. *42*

*Amendment to the Code of Student Conduct Regarding Title IX Sexual Harassment* ............. *42*

Purpose of Appendix ................................................................................................................. 42

Implementation .......................................................................................................................... 43

Sexual Harassment Defined ...................................................................................................... 43

Resources and Reporting ........................................................................................................... 47

Supportive Measures and Emergency Removals ....................................................................... 50

Filing a Formal Complaint ......................................................................................................... 53

Determining if Title IX Applies ................................................................................................. 53

Appeals of the Dismissal of Formal Complaints ...................................................................... 55

Title IX Grievance Procedure: Investigation, Hearing, Outcomes,Appeal ............................... 55

Presumptions of Good Faith and Non-Responsibility ............................................................... 56

Advisors ...................................................................................................................................... 56

Procedural Review ..................................................................................................................... 57

Investigation .............................................................................................................................. 58

Training, Conflict of Interest, and Bias .................................................................................... 62

# THE TULANE UNIVERSITY CODE

## I. PREAMBLE AND THE CORE VALUES

Welcome to Tulane University!  We share a common goal—working to make the most of your educational experience.  Our long history of delivering a world class liberal arts education to a diverse and multicultural student body in the heart of America's most culturally vibrant city has taught us that the best way to assist students in their learning process is with a managed educational experience.  Your learning experience at Tulane will be more than attending classes taught by dedicated instructors; your learning experience will be immersive and holistic, with learning opportunities inside and outside the classroom.

We will be here to facilitate your learning process in a variety of ways, including asserting the University's expectations of your time in this educational community.  Tulane's expectations are encapsulated in this code. We will expect you to take primary responsibility for your well-being and educational growth. And though we may be engaged actively in your learning experience, we will not make choices for you or assume your responsibilities, as this is how you learn.

The Tulane University educational experience is a *voluntary educational* community. As willing participants in our community, we rely on your best efforts. We expect you to accept the core values of our community. All of our values, policies and rules are connected to, and support, our academic mission.

To foster a community where everyone thrives, the Division of Student Affairs values:

*Collaboration, Integrity, Empathy, Equity, Well-being, and Innovation*

We rely upon the Core Values in our educational interventions. Our Core Values are not mere platitudes.  We utilize them in the administration and functioning of the Tulane Code to facilitate your learning process. The Core Values will also guide *you* in your decision-making. We expect members of the Tulane community to understand and accept the rules of the Tulane Code and the Core Values. Even when there is no clear rule for behavior, we expect community members to act in accordance with our Core Values: Remember that the absence of a rule never justifies poor decision-making.

In addition to our Core Values, members of the Tulane University community believe deeply in respect for the rule of law. Respect for the rule of law includes respecting the important space the law carves out for educational interactions without excessive external interference. We are not a court system. Some of our standards, principles, and practices have similarities to the legal system—and sometimes the law actually dictates what we must do and say—but legal mandates exist in the Tulane Code for educational purposes. This Code of Student Conduct is

meant to be in compliance with local, state and federal regulations, including 2020 Title IX requirements and CRF 106.

Our relationship with students is fundamentally aspirational and emergent—we seek to work together to create positive educational experiences for the members of our educational community. Our motto "*non sibi sed suis*"—Latin meaning "not for one's self but for one's own"—inspires us to this goal. As such, what you will learn from your Tulane University experience depends upon what you put into it, how you treat others, and how faithfully you adhere to our shared core values and the rules that flow from those values.

The Tulane Code is a pillar of the educational systems we use to guide and manage the learning experience and is a living document.  Our Code operates through the people who administer it and you!  This is your Code and we expect you to operate in accordance with the Code without intervention by us. Most times, Tulane students follow the Code without any intervention from us. When choices do not align with our Code, we will insist upon accountability.   Choices have consequences and we will ask you to accept those consequences. You will note that we highly value candor, respect for our processes, and good faith efforts at constructive self-assessment in the Tulane Code and in our core values.  When possible, Tulane utilizes restorative practices in resolving disputes when there is a known negative impact to individuals and/or communities. Restorative practices are rooted in repairing any harm done to others as a result of actions done by a Tulane student.  Restorative practices may not be suitable for every situation.  The Director of Student Conduct reserves the right, in consultation with relevant partners, to enable restorative approaches.  Tulane embraces the following principles from Restorative Approaches:

> ❖ Community is important
> ❖ Everyone can influence others
> ❖ We can learn from each other
> ❖ Healthy self-reflection is crucial
> ❖ Expression of emotions is valued
> ❖ We seek to repair harm.

## II. SCOPE OF THE CODE

The Tulane Code applies in and to members of our community broadly. The Code applies to all full and part-time University students, graduate, professional and doctoral students, student employees, and student organizations. A person becomes a student when the person is 'in attendance' at the institution. At Tulane, a student is 'in attendance' when the student has deposited and registered for an academic term. A student is deemed enrolled throughout their time here, including during summer session, study abroad programs, academic and

conduct suspensions, and other absences where there is an expectation of continuing progress toward a Tulane University degree.

In certain cases, graduate and professional students, or student organizations may also be held accountable for non-academic misconduct through professional or organizational standards or codes of ethics. This does not preclude the University from taking action in accordance with the Code of Student Conduct.

The Tulane Code applies on and off campus. It also applies to on-line and electronic domains. Tulane University may choose to apply the Tulane Code at any time and in any context in which the University has an identifiable interest.  The Director of Student Conduct or designee has discretion, subject to discretionary review by the Vice President for Student Affairs, to determine the jurisdiction and parameters of the Code.

## III. COMMUNICATION, AND RESPECTFUL AND MEANINGFUL PARTICIPATION

The official mode of communication at Tulane University is via email at your Tulane University account.  The Office of Student Conduct (as well as many other offices) uses a software system called Maxient systems to communicate with students through their Tulane email addresses.  In order for us to remain in contact with each other, all members of the community are expected to use due diligence in maintaining and checking their accounts for messages, normally on a daily basis. Failure to do so may result in adverse consequences. Members of the Tulane University community are expected to participate, when asked to do so by the University, in proceedings associated with this Code and to do so in a respectful and meaningful way. We welcome vigorous disagreement in our community; some educational conversations are challenging. However, contempt for Tulane University Code process, the administrators who operate that process, or individuals involved in the process shows lack of congruence with our core values.

## IV. TIMEFRAMES

Consistent with the goal to maximize educational opportunities, Tulane University will seek to resolve all disputes under this Code promptly and equitably—usually within no more than one academic semester, depending on when a matter is brought to the attention of the University. More minor violations are usually addressed in a much shorter timeframe, often within a few weeks or less.  Special timeframes apply to incidents involving discrimination; for example, with matters involving Title IX, the university seeks to resolve the case within 180 days or less.  For purposes of resolving disputes under this Code, a "day" is defined as a "business day."  Business days do not include weekends, breaks, or holidays.

Time frames may be extended as necessary to ensure the integrity and completeness of the investigation, comply with a request by external law enforcement, accommodate the availability of witnesses, accommodate delays, account for University breaks or vacations, or address other legitimate reasons, including the complexity of an investigation (including the number of witnesses and volume of information to be considered) and the severity and extent of the alleged conduct. Best efforts will be made to complete the process in a timely manner by balancing the need for thoroughness, fundamental fairness, and promptness.

## V. ADVISORS

Students, or student organizations, may choose to bring one advisor with them when engaging in any of the following processes. In issues involving sexual and/or gender-based harassment and violence, this advisor may be anyone of the student's or organization's choosing, including an attorney.  In all other cases, this advisor must be a current faculty, staff, or student from within the Tulane community. For organizations, this would include advisors to their organizations.  The role of this advisor is to assist the student or organization in reflecting on their choices and to assist with the learning process. Advisors may not speak on behalf of the student or organization and may not take an active role in educational conferences, administrative hearings, student hearing panels, or investigations.  Students may also request assistance from a case manager from the Office of Case Management and Victim Support services at any time.  In more serious allegations, whether you are a respondent or complainant, one may be assigned to you.

In Title IX Sexual Harassment cases (those matters that fall into the behavior defined in Appendix A: Title IX Sexual Harassment Appendix), advisors have a more involved role in the required live hearing. Please refer to Part VIII of Appendix A to learn more about the advisor role in these cases.

## VI. PROCESS

The Tulane Code relies heavily upon *educational conferences* but utilizes other processes as well. *Gatekeepers*, described below in Subsection (A), play an important role in determining the pathway for educational interventions, including whether a matter proceeds to an *educational conference, administrative hearing, student hearing panel* or *investigation*. *Investigations* take place when major transgressions of Tulane University rules may have occurred, which may include matters involving Title IX issues, discrimination against a protected class, and/or matters that may result in expulsion, suspension, or revocation of recognition of a group. *Major matters* involve the potential that Tulane University will exercise its rights to terminate or suspend the voluntary association with an individual or group. *Major matters* may also involve serious, long-term, adverse consequences for an individual or group. Any student involved

in any conduct process begins with no presumptions of wrongdoing. Tulane University uses an investigative procedure administered by trained professionals, subject to substantial review and specified rights to appeal. This process is described in Subsection (E).  Students may not record any portion of any conduct process without express written permission given in advance. Transcripts of any approved recording will be made available when possible and/or required as outlined in later procedures.

## A. Gatekeepers

When a situation comes to the attention of the Director of Student Conduct, the Director of Student Conduct may determine if a situation is properly handled by the individual student conduct process or the organizational conduct process. To determine where a situation involving the individual student conduct process travels from initial notice, the Director of Student Conduct may consult with the Title IX Coordinator and/or the Office of Institutional Equity to determine whether the matter should proceed to an educational conference or move directly to an administrative hearing, or in situations involving potentially major matters, the investigative procedure. The process is similar when the organizational conduct process will be initiated. However, in these matters the Director of Student Conduct may consult with the Title IX Coordinator, the Office of Institutional Equity, and/or the Assistant Vice President for Campus Life.

**Minor Matters**
In *minor matters*, the Director of Student Conduct, in consultation with other gatekeepers, as appropriate, may choose to refer a matter to either an administrative hearing in the student conduct process or a student hearing panel in the organizational conduct process. These two processes are described below.  Direct referral to either the administrative hearing process or student hearing panel will occur with written notice via email to either the student or the organization, respectively.  The notice will inform the student or organization of concerns relating to the minor violations of Tulane University rules and will specify the time and date for further proceedings under the administrative hearing process or the student hearing panel process.

**Major Matters**
The Director of Student Conduct, in consultation with the appropriate gatekeepers, may also determine that a situation might potentially be a *major matter*, requiring investigation. *The mere fact that a situation is being referred for investigation does not indicate any determination of transgression of any kind.  The investigation process is exactly that—a neutral and fair investigation with no presumptions of wrongdoing.* It will be up to the investigator/adjudicator and/or decision maker to make determinations regarding any potential transgressions subject to review and rights to appeal. In addition, no inference of transgression should be inferred from the manner in which individuals choose to frame their situations to an investigator.

Title IX federal regulations require universities to include specific process requirements as it relates to sexual misconduct and Sexual Harassment, including a gatekeeper function. Those are outlined in detail below and in Appendix A: Title IX Policy and Procedures.

## B. Educational Conferences/Organizational Partnership Process

The educational conference or partnership process for organizations is an important instructional tool at Tulane University, and students and student organizations should expect to participate in this process. When the University becomes aware of a student who may not be meeting the core values and expectations of a Tulane University student and/or may have violated Tulane Code Rules (excluding sexual assault), the Office of Student Conduct or their designee, often Residence Life or Campus Life, can choose to resolve this concern through an educational conference instead of the more formal resolution process.

The educational conference is an opportunity for a student or organization to discuss critical decisions, options, or to take responsibility for correcting any error in judgment and determine how to repair any harm that may have affected other individuals or the community. The educational conference may feature critical examination of a student's or organization's decision-making and a discussion of choices the student or organization has made. It is also proactive, allowing staff to speak with students about worrisome patterns of behavior or to prevent foreseeable negative outcomes, like discussions of risk management for events. It can also be an opportunity for students to share concern for other members of the community, to discover resources, to seek mentorship and guidance, and so on.

In addition to the Office of Student Conduct initiating an educational conference, Tulane administrators and faculty may directly request that the Office of Student Conduct have an educational conference about a concern; students and organizations may also request conferences for themselves or for other members of the Tulane community to address concerns or needs. To make a request, please contact the Director of Student Conduct at conduct@tulane.edu. The Director will decide whether an educational conference is appropriate and may consult with the Title IX Coordinator and/or the Office of Institutional Equity, and if the request for an educational conference involves organizational issues, the Director of Student Conduct may additionally consult with the Assistant Vice President for Campus Life. Any decision on whether to have or not have an educational conference is final and unreviewable.

The student or organization is expected to participate fully in the educational conference when asked to do so. Refusal to participate in the educational conference process in whole or in part, may have the significant consequence of triggering other

educational interventions, including the potential of referral of a situation to *administrative hearing, student hearing panel, or investigation.*

There are many potential outcomes in an educational conference. In some situations, a student or organization may be asked to agree to a *learning action plan*. A *learning action plan* may feature some of the consequences outlined in the section of this Code designated "Consequences," other than suspension or expulsion or revocation of recognition of a group.  It is the responsibility of the student to complete this *learning action plan* in the manner and timeframe determined by the conduct officer.

Sometimes during an educational conference it becomes clear that a situation would be better addressed through a more formal process, such as an *administrative hearing, student hearing panel* or *investigation*. The conduct officer has the discretion to end the educational conference in lieu of these other processes.

## C. Administrative Hearing

A situation under the student conduct process may be referred to an *administrative hearing*, conducted by a single conduct officer. A student will receive notice via email from Maxient that an administrative hearing will occur, including information as to why the student is being called to an administrative hearing.

The precise functioning of the administrative hearing is in the discretion of the conduct officer, so as to allow sufficient flexibility for the conduct officer to properly assess the situation presented.

The conduct officer will review with the student relevant initiating information such as an incident report or other information that may support a determination that a transgression of the Tulane University Code has occurred, so as to offer the student the opportunity to respond and to present relevant witnesses or information. The conduct officer has the discretion to consider what, if any, relevant witnesses or information may be introduced, including the discretion to seek additional information not provided initially or by the student. The conduct officer also has the discretion to determine the weight and sufficiency of the information, and is charged with assessing the credibility of witnesses, if appropriate to do so, in making a determination.

After reviewing all of the evidence, the conduct officer will make a determination regarding whether any transgression of rules has occurred, and if applicable, appropriate consequences.  The conduct officer will use the "preponderance of the evidence" standard to determine whether any transgression has occurred.  This standard means that there should be a sufficient quantity of information of sufficient quality for the conduct officer to make a responsible educational determination that, *more likely than not*, any transgression of rules has occurred. In some situations,

the preponderance of the evidence standard will be applied in a way that the conduct officer is unable to make a responsible educational determination that any transgression either did or did not occur. This determination may be the result when there is neither sufficient information nor information of sufficient quality to make a responsible educational decision. Students are reminded that this particular determination is not a validation of choices made or not made, and that operating according to the core values of Tulane remains imperative. Tulane University students are also reminded that the conduct officer will not be using standards for the assessment of information that are used in court, such as the "beyond a reasonable doubt" standard. Moreover, because the administrative hearing is not a legal proceeding, rules of evidence such as might be used in court or arbitration are not required. The conduct officer will be evaluating information from an educational perspective in pursuit of Tulane University's educational goals.

The conduct officer's determination will be transmitted in writing to the student via email. The determination will include a recitation of whether or not there has been a determination of a transgression and which, if any, of Tulane University rules are implicated, and will also provide information about the consequences for any transgression. The conduct officer however may *not* assess consequences of expulsion or suspension. If at any time during the administrative hearing process the conduct officer believes that a major violation may have occurred, the conduct officer will contact the Director of Student Conduct to trigger a gatekeeping assessment of whether the situation should be referred to the investigative process.

In our experience, students often accept the findings and consequences of an administrative hearing and, therefore, the determination of the conduct officer is final. Nothing in this subsection prohibits administrators charged with review responsibilities from reviewing this final determination of the conduct officer, or consulting with the conduct officer.

## D. Student Hearing Panel (Organizations Only)

Cases which are determined to be minor matters in the gatekeeping process may be referred to a *student hearing panel* consisting of three to five members per panel.  The panel will select a chairperson for the hearing. The student hearing panel pool will attend regular meetings during the fall and spring semesters and either consider matters referred to panels or continue their training. As part of the educational function of the student hearing panel, student hearing pool members will engage in integrity and ethics programming for student organizations independent of hearings.

After receipt of a referral from the gatekeepers, a written notification of the hearing will be sent to the organization, in care of its leadership as designated by the organization. The notification will include the time, date and location of the hearing and provide

information regarding the concerns to be addressed in the hearing.  Each organization will have a designee for purposes of receiving notice under the Code.

The student hearing panel will also follow the same procedures as are used in an administrative hearing described above, with the exception that the student hearing panel with a chairperson will make the determinations made by a conduct officer in an administrative hearing.

After hearing relevant information and from relevant witnesses, a majority of the panel may make recommendations regarding transgressions of rules relating to organizations and may also recommend consequences.  The chairperson will forward recommendations with a brief description of the proceedings to the Assistant Vice President for Campus Life or designee, who may choose to accept or reject the recommendations regarding transgressions and consequences.  The Assistant Vice President for Campus Life or designee reviews the recommendations and consequences from the student hearing panel, and may adjust them before they become final, subject to an organization's right to appeal as set forth below.

## E. Investigation of Major Matters (non-Title IX)

When the gatekeepers have determined that the investigation process should be utilized for individual students or for organizations, the matter will be referred to an investigator by the Director of Student Conduct. The University reserves the right to utilize outside investigators and decision makers for adjudication of any major matter.

During the Procedural Review, students will learn about the conduct investigation process in detail, including all rights, privileges, and responsibilities. Students will also learn about the variety of supportive resources in place to help students navigate this process. Students will also learn details about communication and timeline.  Students will receive a written summary of the meeting for their reference.  An advisor may also join students in this meeting.

The Director or the investigator will issue a notice of investigation to necessary parties/persons, including the respondent/s and complainant/s, in compliance with Title IX regulations and the Violence Against Women Act (VAWA).

The investigator will direct the investigation. As the investigation process can be a difficult experience for any student involved--including both respondents and complainants--all investigators are trained in trauma-informed care.  The investigation is designed to provide a fair and reliable gathering of the facts by a trained and impartial investigator, who will determine consequences, if any.  All individuals, including witnesses, will be treated with appropriate sensitivity and respect throughout the

investigation. When possible, the investigation will safeguard the privacy of the individuals involved in a manner consistent with applicable law and the Tulane Code.

During the investigation, the investigator will provide the individuals a fair and equal opportunity to be heard, opportunities to submit information, and to identify witnesses who may have relevant information.  The investigator may speak separately with individuals who are willing to participate and have information relevant to the determination of responsibility. As part of the investigation, the investigator may gather or receive information that is relevant to the determination of appropriate consequences, including information about any impacts on any member of the Tulane community.

The investigator will also gather available physical or documentary evidence, including prior statements, any relevant communications, email messages, social media materials, text messages, and other records as appropriate and available.

In general Tulane University will seek to conclude the investigation within a reasonable amount of time, striving to resolve matters within 180 business days.  The time frame for completion of the investigation, or any designated time frames of steps in the investigation, may be extended for good cause as necessary to ensure the integrity and completeness of the investigation, to comply with a request by external law enforcement, to accommodate the availability of witnesses, to account for Tulane University breaks or vacations, to account for complexities of a case (including the number of witnesses and volume of information provided by the parties), or to address other legitimate reasons as defined by the investigator.  Any extension of the timeframes, and the reason for the extension, will be shared with the impacted individuals in writing.  Best efforts will be made to complete the process in a timely manner by balancing principles of thoroughness and fundamental fairness with promptness.

Where the University is made aware that there is a concurrent criminal investigation, the gatekeepers, or other individuals as appropriate, will coordinate with law enforcement so that any University processes do not interfere with the integrity or the timing of the law enforcement investigation.  At the request of law enforcement or the Respondent, Tulane University may agree to defer the fact-finding portion of its investigation until after the initial stages of a criminal investigation. The Office of Institutional Equity and/or Title IX Coordinator will nevertheless communicate with individuals involved in the investigation regarding resources and accommodations, procedural options, anticipated timing, and the implementation of any necessary interim measures, described later in the Code, for the safety and well-being of all impacted individuals. The investigator will promptly resume fact-gathering as soon as law enforcement has released the case for review following the initial criminal investigation.

All community members, including students, student organizations, faculty and other University employees, are expected to cooperate with the investigation. While students may decline to participate in an investigation, an investigation may proceed in absentia, and students or organizations may receive consequences even if they choose not to participate. In matters involving discrimination against a protected class, the Title IX Coordinator and/or Office of Institutional Equity will consult with the investigator about whether or if to proceed without certain individuals participating. In major matters involving organizations, the investigator is encouraged to consult with the student hearing panel members and the Assistant Vice President for Campus Life.

The investigator and/or decision maker has the discretion to determine the relevance of any witness or other evidence to the finding of responsibility and may exclude information in preparing the investigation report if the information is irrelevant, immaterial, or more prejudicial than informative.

A party's character, history or reputation with respect to other sexual activity is not relevant and will not be considered as evidence.  Similarly, a party's prior or subsequent sexual activity is typically not relevant and will only be considered as evidence under limited circumstances.

Those circumstances include:

> 1. *Pattern Evidence.*  Evidence of an occurrence or occurrences of sexual or other relevant behavior so distinctive or so closely resembling a version of the facts so as to tend to prove a material fact, including whether consent was sought or given, may be admissible.  Where there is evidence of a pattern of similar conduct, either before or after the conduct in question, regardless of whether there has been a prior finding of a policy violation by the responding party, this information may be deemed relevant to the determination of policy violation or assigning of a sanction.  The determination of relevance will be based on an assessment of whether the previous or subsequent incident was substantially similar to the conduct cited in the report or indicates a pattern of behavior and substantial conformity with that pattern. Where there is a prior finding of a policy violation by the responding party for a similar act of prohibited conduct, there is a presumption of relevance and the finding may be considered in making a determination as to responsibility and assigning of a sanction.

> 2. *Prior Sexual History Between the Parties*. Where there was a prior or ongoing relationship between the Complainant and the responding party, and the responding party asserts that consent was sought and given, the prior sexual history between the parties may be relevant to assess the manner and nature of communications between the parties. As noted in other sections of the policy, however, the mere fact of a current or previous dating or sexual relationship, by itself, is not sufficient to constitute consent.

3. *Prior Sexual History with Other Parties.* A party's sexual history with an individual other than the Complainant or responding party may be relevant under very limited circumstances to prove intent, motive, absence of mistake, or to explain an injury or physical finding.

At the discretion of the University, multiple matters may be consolidated in one investigation.

At the conclusion of the investigation, the investigator will prepare a written report that summarizes the information gathered, synthesizes the areas of agreement and disagreement among or between individuals and/or organizations with any supporting information or accounts, and includes an investigative finding regarding whether any rule has been violated.  However, before the report is finalized, necessary individuals and/or organizations will be given the opportunity to review a draft of the investigation report for ten (10) business days, which may be presented in redacted format to protect the privacy rights of individuals involved in the investigation. Reviewing parties may submit comments to the draft report and submit questions they would like posed to other parties. Whether to pose questions or seek additional information will remain at the investigator's discretion based on the investigator's determination of relevance.

Upon receipt of any additional information from individuals and/or organizations involved in the process, or after the ten (10) business day comment period has lapsed without comment, the investigator will make a final investigative determination, by a preponderance of the evidence, regarding whether a rule transgression has occurred and will recommend consequences, if any.  In reaching these determinations, the investigator may consult with the Office of Institutional Equity, the Title IX Coordinator, and any designated administrator who has information relevant to the investigation. The investigator may also seek information from the Office of Student Conduct regarding prior disciplinary history and Tulane University Police Department regarding prior criminal history.

The Complainant and Respondent will be provided the opportunity to submit a written Impact Statement. These written Impact Statements will not be considered in the determination of responsibility, but will be provided to the investigator, and at the appropriate stage of the process, to the disciplinary authority or Hearing Panel for consideration in the determination of the sanction and remedy. The Impact Statement may be submitted at any time in the process, provided that it is received no later than ten (10) days after the parties have been given notice of the opportunity to review the draft Investigative Report. The parties may submit a supplemental Impact Statement to the disciplinary authority or Hearing Panel if there is a change in circumstances warranting an updated Impact Statement.  The Impact Statements will be shared with

the parties and may be redacted at the discretion of the investigator, or in accordance with FERPA.

The investigator may also consider a community Impact Statement as appropriate based on the nature and facts of the circumstances and the extent to which the conduct at issue was directed at and created a hostile environment for community members beyond the Reporting Party.  The investigator may limit the submission or use of community Impact Statements.

Complainants in cases of sexual assault, sexual harassment, intimate partner violence, sexual exploitation or stalking will be informed of the outcome in formal adjudication. In other cases in which a student is charged with a non-sexual act of violence, complainants may receive the outcome upon request.  The final investigative determination may be redacted in light of privacy rights of impacted individuals.  In determining the appropriate consequences, the investigator shall consider the following factors:

- The nature of any behavior, including violence;
- The impact of behavior on other individuals or groups;
- The impact or implications of the behavior on the community or the University;
- Prior transgressions, both at the University or elsewhere, including criminal convictions;
- Whether a student or student organization has accepted responsibility for the conduct;
- Maintenance of a safe and respectful environment conducive to learning;
- Protection of the University community;
- Any applicable professional standards of behavior; and,
- Any other mitigating, aggravating, or compelling circumstances to reach a just and appropriate resolution in each matter.

In investigations of major matters of organizational misconduct, the investigator will submit their findings to the Student Hearing Panel described in section IX.D. After reviewing the investigator's findings and rationale, the panel will recommend consequences for the organization. The chairperson will then forward the investigator's findings, along with the panel's recommendations and a brief description of the proceedings to the Assistant Vice President for Campus Life or designee, who may choose to accept or reject the recommendations regarding transgressions and consequences. The Assistant Vice President for Campus Life or designee reviews the recommendations and consequences from the student hearing panel, and may adjust them before they become final, subject to an organization's right to appeal as set forth below.

## F. Title IX "Sexual Harassment" Grievance Procedures (Title IX)

The investigation of "Sexual Harassment" Title IX matters is informed by the May 2020 Amendments to the Title IX Federal Regulations (34 C.F.R. part 106), and will follow the investigation process outlined in Section G. above with the following noted exceptions: The Title IX coordinator or designee will serve as gatekeeper for any report of sexual misconduct or Sexual Harassment.  This includes all reports in which a student is identified as the Respondent. This gatekeeping function, as well as Tulane's response to Title IX reports and Supportive Measures available to Complainants and Respondents, is explained in detail in Appendix A.

In general, the gatekeeping process for cases involving student Respondents will result in the following actions:

1. The Title IX Coordinator sends the case through Title IX conduct process; or
2. The Title IX Coordinator determines that the case should be dismissed as a Title IX Sexual Harassment matter, but the case is then sent through non-Title IX conduct process; or,
3. The case is dismissed.

The Title IX coordinator may also create a voluntary informal process in which all parties agree and is subject to approval by the Office of Student Conduct.

If a case is routed through the Title IX path, the Director of Student Conduct will meet with the Complainant/s to outline possible options (investigation, administrative hearing, informal resolution, etc.), determine the next step forward and conduct a procedural review with any and all Complainants and Respondents.
Cases in the *Investigation of Major Matters (Title IX)* process must meet all of the following criteria:

- The Respondent and Complainant must be currently enrolled students.
- The alleged conduct happened on campus, at a university event, or at an off-campus designated campus location (i.e. fraternity or sorority house).
- The alleged conduct happened in the United States.
- The alleged conduct must meet one or more the below listed definitions of sexual misconduct or Sexual Harassment.
- The University must have a signed complaint, signed either by the Complainant or the Title IX Coordinator.

Either before or after a Formal Complaint has been filed, the Office of Student Conduct will conduct a Procedural Review with a Complainant. A Procedural Review is

informational and does not initiate the conduct process unless a Complainant expressly states they want to initiate that process. During the Procedural Review, students will learn about the conduct investigation process in detail, including all rights, privileges and responsibilities.  Students will also learn about the variety of supportive resources in place to help students navigate this process.  Students will also learn details about communication and timeline.  Students will receive a written summary of the meeting for their reference.  An advisor may join students in this meeting.

Once a Formal Complaint has been filed, a Procedural Review will be scheduled with the Respondent to ensure they are provided with the same information about the process and have the opportunity to ask questions. Complainants and Respondents are able to bring their Advisor to Procedural Reviews, though Tulane will go over the information shared in the meeting with any Advisor if they are unable to attend.

Tulane makes no determinations as to the outcome of an allegation until the completion of an investigation; this includes a presumption that the Respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process. Upon completion of all procedural reviews, a detailed notice of allegations, charges and investigation will be sent to all Respondents and Complainants.

If there are any emergency measures like removals levied, those will be communicated and any appeal process for those measures will be applied.  The case will then be turned over to the investigator to begin the investigation.   Again, as the investigation process can be a difficult experience for any student involved--including both respondents and complainants--all investigators and adjudicators are trained in trauma-informed care.

Investigators will draft a complete investigative report, outlining material facts (those in dispute and not in dispute); collecting all Respondent, Complainant and relevant witness and impact statements; asking any needed follow up questions; and collecting and organizing all relevant evidence. The investigator will evaluate all relevant evidence – including both inculpatory and exculpatory evidence.

Credibility determinations will not be based on a person's status as a Complainant, Respondent, or witness. The report will then be turned over to a separate decision maker for adjudication.  This report will be reviewed by the Director of Student Conduct and the Title IX Coordinator for compliance and consistency purposes. The decision maker may gather additional information, including speaking with any identified party.

The decision maker will then preside over a live hearing, in which advisors of both the Respondent and Complainant may cross-examine any individual that has made a statement or provided evidence, including any and all witnesses, the Respondent or the Complainant.  Each party must be represented by an advisor.  If the Complainant or Respondent does not have an advisor, the University will provide one. If the student's

chosen advisor does not appear, the University will appoint an advisor to provide cross-examination of the evidence on the student's behalf. The decision maker will determine if a question or evidence is relevant or admissible.  The decision maker may question witnesses, the Respondent and Complainant.  At no time will advisors answer on behalf of their students.

The decision maker will make a finding of responsible or not responsible for all charges and provide a rationale for each finding.  The decision maker will make an independent decision based on a thorough review of all relevant evidence collected.

If there is a finding of responsibility, the decision maker will consider the scope of the case, impact on students and community and prior history when assigning sanctions. The decision maker will also decide if remedies are appropriate in order to restore or preserve equal access to their education at Tulane. Such remedies may include the same individualized services described as "Supportive Measures"; however, unlike Supportive Measures, remedies may be disciplinary or punitive. All sanctions must be approved by the Director of Student Conduct and remedies approved by the Title IX Coordinator. Upon completion, cases will be turned over to the Office of Student Conduct, the Title IX office, and any other appropriate administrators for sanction and remedy implementation.

Complainants in cases of sexual assault, sexual harassment, intimate partner violence, sexual exploitation or stalking will be informed of the outcome in formal adjudication.

A Respondent in these cases may acknowledge responsibility at any time and accept sanctions imposed by the Office of Student Conduct.  A Complainant may withdraw the complaint at any time.  Either of these occurrences would cease any investigation. Sanctions for a finding of responsibility for these cases ranges from a warning to expulsion and may also include a variety of educational sanctions. Supportive Measures cannot be used as sanctions.

## G. Alternative Resolution Options

Alternate Resolution Options may be available in lieu of formal conduct processes, including the Investigation of Major Matters or Title IX Grievance Procedures. Alternative resolution may be used only when both parties, and the University, are in agreement on the process and outcomes. Alternative resolutions are voluntary and may include a *final* resolution. Students can request to move from the informal to the formal process at any time before a final resolution is reached; once a final resolution is reached, a student cannot request to move to the formal process.  Options in the alternative resolution category include--but are not limited to--mediation, restorative justice, educational conferences and workshops and other educational and developmental options.

## H. Appeals

Any student or organization found to have transgressed any rules in the Tulane Code has a right to appeal the determination of the finding and/or consequences delivered for, and only for, specific reasons set forth below. Ordinarily, a student or organization has ten (10) days to file an appeal from the delivery of written notice of final outcome from an investigator, conduct officer in an administrative hearing, or the chairperson of a student hearing panel.

For appeals submitted by an individual student, the appellate panel will consist of three members. Panel members will be drawn from the appeal panel pool, which will consist of Tulane faculty, staff, and students who have been trained in the process. Students will not serve on panels in matters relating to Title IX matters.  For appeals submitted by a student organization, the appellate panel will have the same structure as that of the Student Hearing Panel. In this situation, individuals who served on the original hearing panel will not be allowed to serve on the appellate panel for the same case.

A student or organization may petition the Director of Student Conduct for modification of this time frame.

1. Procedural Error
Material deviation from procedures that substantially impacted determinations of responsibility or sanctions applied (this may include a bias or conflict of interest);

2. New and Substantial Evidence
New and substantial evidence appeared that could have not reasonably been discovered before the determination of responsibility was made. In matters involving discrimination against a protected class, the time frame for an appeal based on newly discovered information may be extended at the discretion of the Office of Institutional Equity and/or Title IX Coordinator where the evidence could not reasonably have been discovered within the time frames of the investigation and compelling justification exists for its consideration. If the appellate panel determines an appeal is warranted on this basis, the matter will be remanded for rehearing. After rehearing, the appellate panel will consider whether the newly discovered information was fully and properly considered, but the appellate panel will not re-hear the matter as if for the first time. If the appellate panel does believe that newly discovered information was fully and properly considered, after so ordering, the appellate panel may take appropriate action, including dismissing a matter or ordering that the matter be reconsidered by the gatekeepers for further action under the Code;

3. Disproportionate Sanctions

Where sanctions are grossly disproportionate to the findings of responsibility;

4.Bias or conflict of interest (Title IX cases only)

Any individual or organization may appeal any outcome, for the above referenced reasons, in an administrative hearing, student hearing panel, or investigation in which they were a Respondent (or a Complainant for VAWA or Title IX matters only). Dissatisfaction with the results of a hearing is not itself a valid basis for appeal. Appeals are also not an occasion to engage in contempt of the conduct process, administrators, or students who participated in Code process.

The appeal must consist of a plain, concise, and complete written statement outlining the grounds for appeal and all relevant information to substantiate the basis for the appeal. The appeal must be sent to the Director of Student Conduct via email. The Director of Student Conduct will acknowledge receipt of the written appeal in writing. The appropriate gatekeepers—depending on the process used and issues raised—will then assess the written appeal to determine whether the appeal is timely filed and, if so, whether the appeal is properly framed based on the permissible grounds.  If the gatekeepers determine that the appeal does not properly fit within one of the specific grounds for appeal, the appeal will be denied. If the appeal is properly filed, the appellate panel may offer impacted individuals the opportunity to review the written appeal and offer their perspectives to the appellate panel.  If multiple individuals appeal, the appeal documents from each party will be considered together in one appeal process.  In all appeals, the appellate panel will presume that decisions were made reasonably and appropriately, unless there is compelling information to the contrary.  Appeals are not intended to be a rehearing of the matter. Most appeals consist of a review of the written documentation or record of the original hearing and pertinent documentation regarding the grounds for appeal.  The appellate panel may speak to the investigator, the student hearing panel chair, the conduct officer who conducted an administrative hearing, or any impacted individuals, as appropriate. Depending on the nature of the requested appeal(s), the appellate panel may, by majority vote:

- Affirm the determination of transgressions or consequences in whole or in part;
- Alter the determination of transgressions or consequences in whole or in part;
- Return the matter to the conduct officer or hearing panel with instructions to reconvene to cure a procedural error or reconsider the consequences delivered, or otherwise act in accordance with 2. above.  No situation will ever be remanded for reconsideration more than once.

The appellate panel will transmit via email a written decision generally within ten (10) business days from the date of the appeal. Appeal decisions are final with the

exception of matters that are remanded for further consideration, which may be subject to appeal following the remand.

# VII. RULES

## *A. General Misconduct*

The following are examples of misconduct; they are not intended to define misconduct in exhaustive or exclusive terms and should be construed broadly according to the fair import of their terms.

Students or organizations who *attempt* to commit acts prohibited by the Code may be held responsible to the same extent as students or organizations who actually violate the Code, and accomplices in acts prohibited by the Code may be held responsible as violators.  Similarly, a student host or student organization may be held responsible for the violations of the Code by a guest.  It is a student host's or organization's responsibility to ensure that guests comply with the Code.

The following actions or any actions that violate the principles of the Preamble to this document violate Tulane University standards of conduct and will result in conduct action as described above in VIII. Process.

1. Causing harm or reasonable apprehension of harm.

2. Interference with any educational process or other University sponsored activities, including material disruptions in the classroom or other learning environments.

3. Use, possession, or storage of any weapon or ammunition, use of an item in a manner that poses a potential hazard to the safety or health of others, and/or violation of the University's Weapons Policy.

4. Violation of the University's Tobacco and Smoke Free Community Policy.

5. Unauthorized use, misuse and/or possession of any controlled substance or illegal drug or inhalant for the purposes of intoxication (including, but not limited to, whippets).

6. Unauthorized use and/or possession of any drug paraphernalia. The term "drug paraphernalia" broadly includes any material, product, instrument, or item used to create, manufacture, distribute, use, or otherwise manipulate any drug and includes, but is not limited to, pipes, bongs, and hookahs.

7. Distribution or possession for the purpose of distribution of any controlled substance or illegal drug.

8. Use, possession, or distribution of alcoholic beverages in violation of the *Tulane University Alcohol & Other Drug Policy*.

9. Hazing. Hazing includes, but is not limited to, acts of servitude and/or behavior that humiliates, degrades, embarrasses, harasses or ridicules an individual, or otherwise is harmful or potentially harmful to an individual's physical, emotional, or psychological well-being, as an actual or apparent condition for initial or continued affiliation with any group. A student or organization violates this standard regardless of either the lack of intent to cause harm or the hazed individual's own willingness to participate. Unless affirmative steps were taken by the responding student or organization to prevent the hazing behavior, conduct charges may be brought against the group, officers of the group, and members of the group who are deemed to have encouraged the behavior, in addition to any conduct action against persons who engaged in the hazing behavior. (See the University's Hazing Policy for complete policy.)

10. Initiating or causing to be initiated a fire, explosion, or other emergency.

11. Initiating or causing to be initiated any false report or warning of fire, explosion or other emergency.

12. Inappropriate use of safety, emergency, or firefighting equipment or any other violation of Tulane's Fire Safety Procedures.

13. Unauthorized entry or access into University buildings or areas, including construction sites, athletic facilities, student rooms or offices, even if unlocked.

14. Unauthorized use of University facilities, such as spaces or grounds.

15. Unauthorized access or use of computer equipment, networks, software or data, including violation of the Tulane Computer Services policies.

16. Furnishing false information to the University or to a University official.

17. Acts of fraud or attempted fraud, including but not limited to acts of fraud committed by forgery, by alteration or use of University documents, records, or identification, or by other means.

18. Interference with the freedom of expression of others.

19. Theft of property or services or knowing possession of stolen property.

20. Damage to or vandalism of the property of others.

21. Failure to comply with the directions of University officials, including but not limited to campus police officers, acting in the performance of their duties.

22. Harassment or intimidation.

23. Cyberbullying.

24. Lewd or obscene conduct.

25. Disruptive or disorderly conduct.

26. Violation of other University principles, policies, or rules, including but not limited to public health mandates, tailgating or game day policies, policies of the Office of Fraternity & Sorority Programs, policies of the Office of Campus Life, residence hall rules, and rules concerning entry and use of University facilities, sale or consumption of alcoholic beverages, use of vehicles, or misuse of identification cards.

27. Arrest or conviction of violation of federal, state, or local laws, when the University has an identifiable interest. This includes, but is not limited to, circumstances in which the imposition of a sentence has been deferred by the court and a court has set the conviction aside and dismissed the prosecution.

28. Joint responsibility, which includes action in collusion with another to violate the Code of Student Conduct or inaction to prevent, or which condones a known, imminent violation of the Code of Student Conduct.

29. Creating or contributing to behaviors which jeopardize the relationship between the University and the greater community, including failure to comply with public health mandates.

30. Discrimination or harassment in employment practices or educational programs/activities on the basis of race, color, sex, religion, national origin, age, disability, genetic information, sexual orientation, gender identity, gender

expression, pregnancy, marital status, military status, veteran status, or any other status or classification protected by federal, state or local law.

31. Retaliation means any adverse action intentionally taken against a person for making a good faith report of prohibited conduct or participating in any proceeding under this policy. Retaliation includes intentionally threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of prohibited conduct. Retaliation does not include good faith actions lawfully pursued in response to a report of prohibited conduct.

32. Sexual Assault

Sexual Assault consists of (a) Sexual Contact and/or (b) Sexual Intercourse that occurs without (c) Affirmative Consent.

a. Sexual Contact is:
- Any intentional sexual touching
- However slight
- With any object or body part (as described below)
- Performed by a person upon another person

Sexual Contact includes (i) intentional touching of the breasts, buttocks, groin or genitals, whether clothed or unclothed, or intentionally touching another with any of these body parts; and (ii) making another touch you or themselves with or on any of these body parts.

b. Sexual Intercourse is:
- Any penetration
- However slight
- With any object or body part (as described below)
- Performed by a person upon another person

Sexual Intercourse includes (i) vaginal penetration by a penis, object, tongue, or finger; (ii) anal penetration by a penis, object, tongue, or finger; and (iii) any contact, no matter how slight, between the mouth of one person and the genitalia of another person.

c. Affirmative Consent is:
- Informed (knowing)
- Voluntary (freely given)

- Active (not passive), meaning that, through the demonstration of clear words or actions, a person has indicated permission to engage in mutually agreed-upon sexual activity

Affirmative Consent cannot be obtained by Force. Force includes (i) the use of physical violence, (ii) threats, (iii) intimidation, and/or (iv) coercion.

i. *Physical violence* means that a person is exerting control over another person through the use of physical force. Examples of physical violence include hitting, punching, slapping, kicking, restraining, choking, and brandishing or using any weapon.

ii. *Threats* are words or actions that would compel a reasonable person to engage in unwanted sexual activity. Examples include threats to harm a person physically, to reveal private information to harm a person's reputation, or to cause a person academic or economic harm.

iii. *Intimidation* is an implied threat that menaces or causes reasonable fear in another person. A person's size, alone, does not constitute intimidation; however, a person's size may be used in a way that constitutes intimidation (e.g., blocking access to an exit).

iv. *Coercion* is the use of an unreasonable amount of pressure to gain sexual access. Coercion is more than an effort to persuade, entice, or attract another person to have sex. When a person makes clear a decision not to participate in a particular form of Sexual Contact or Sexual Intercourse, a decision to stop, or a decision not to go beyond a certain sexual interaction, continued pressure can be coercive. In evaluating whether coercion was used, the University will consider: (i) the frequency of the application of the pressure, (ii) the intensity of the pressure, (iii) the degree of isolation of the person being pressured, and (iv) the duration of the pressure.

Affirmative Consent cannot be gained by taking advantage of the incapacitation of another, where the person initiating sexual activity knew or reasonably should have known that the other was incapacitated. Incapacitation means that a person lacks the ability to make informed, rational judgments about whether or not to engage in sexual activity.

A person who is incapacitated is unable, temporarily or permanently, to give Affirmative Consent because of mental or physical helplessness, sleep, unconsciousness, or lack of awareness that sexual activity is taking place. A person may be incapacitated as a result of the consumption of alcohol or other drugs, or due to a temporary or permanent physical or mental health condition.

The University offers the following guidance on Affirmative Consent and assessing incapacitation:

A person who wants to engage in a specific sexual activity is responsible for obtaining Affirmative Consent for that activity. Lack of protest does not constitute Affirmative Consent. Lack of resistance does not constitute Affirmative Consent. Silence and/or passivity also do not constitute Affirmative Consent. Relying solely on non-verbal communication before or during sexual activity can lead to misunderstanding and may result in a violation of this Policy. It is important not to make assumptions about whether a potential partner is consenting. In order to avoid confusion or ambiguity, participants are encouraged to talk with one another before engaging in sexual activity. If confusion or ambiguity arises during sexual activity, participants are encouraged to stop and clarify a mutual willingness to continue that activity. Affirmative Consent to one form of sexual activity does not, by itself, constitute Affirmative Consent to another form of sexual activity. For example, one should not presume that Affirmative Consent to oral-genital contact constitutes Affirmative Consent to vaginal or anal penetration. Affirmative Consent to sexual activity on a prior occasion does not, by itself, constitute Affirmative Consent to future sexual activity. In cases of prior relationships, the manner and nature of prior communications between the parties and the context of the relationship may have a bearing on the presence of Affirmative Consent.

Affirmative Consent may be withdrawn at any time. An individual who seeks to withdraw Affirmative Consent must communicate, through clear words or actions, a decision to cease the sexual activity. Once Affirmative Consent is withdrawn, the sexual activity must cease immediately.

In evaluating Affirmative Consent in cases of alleged incapacitation, the University asks two questions: (1) *Did the person initiating sexual activity know that the other party was incapacitated? and if not,* (2) *Should a sober, reasonable person in the same situation have known that the other party was incapacitated?* If the answer to either of these questions is "YES," Affirmative Consent was absent and the conduct is likely a violation of this policy.

Incapacitation is a state beyond drunkenness or intoxication. A person is not necessarily incapacitated merely as a result of drinking or using drugs. The impact of alcohol and other drugs varies from person to person.

One is not expected to be a medical expert in assessing incapacitation. Although every individual may manifest signs of incapacitation differently, typical signs include slurred or incomprehensible speech, unsteady gait, combativeness, emotional volatility, vomiting, or incontinence. A person who is incapacitated may not be able to understand some or all of the following questions: "Do you know where you are?", "Do you know how you got here?", "Do you know what is happening?", "Do you know whom you are with?".

One should be cautious before engaging in sexual contact or sexual intercourse when either party has been drinking alcohol or using other drugs. The introduction of alcohol or other drugs may create ambiguity for either party as to whether Affirmative Consent has been sought or given. If one has doubt about either party's level of intoxication, the safe thing to do is to forego all sexual activity.

***Being impaired by alcohol or other drugs is no defense to any violation of this policy.***

33. Sexual Exploitation

Sexual Exploitation is purposely or knowingly doing any of the following:
- Causing the incapacitation of another person (through alcohol, drugs, or any other means) for the purpose of compromising that person's ability to give Affirmative Consent to sexual activity;
- Allowing third parties to observe private sexual activity from a hidden location (e.g., closet) or through electronic means (e.g., Skype or live-streaming of images);
- Engaging in voyeurism (e.g., watching private sexual activity without the consent of the participants or viewing another person's intimate parts (including genitalia, groin, breasts or buttocks) in a place where that person would have a reasonable expectation of privacy);
- Recording or photographing private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without consent;
- Disseminating or posting images of private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts, or buttocks) without consent;
- Prostituting another person or the illegal solicitation of sex acts; or
- Exposing another person to a sexually transmitted infection or virus without the other's knowledge.

34. Intimate Partner Violence

Intimate Partner Violence includes any act of violence or threatened act of violence that occurs between individuals who are involved or have been involved in a sexual, dating, spousal, domestic, or other intimate relationship. Intimate Partner Violence may include any form of prohibited conduct under this policy, including Sexual Assault, Stalking, and Physical Assault (as defined below).

Intimate Partner Violence includes "dating violence" and "domestic violence," as defined by the Violence Against Women Act (VAWA). Consistent

with VAWA, the University will evaluate the existence of an intimate relationship based upon and individual's statement and taking into consideration the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship.

Physical assault is threatening or causing physical harm or engaging in other conduct that threatens or endangers the health or safety of any person. Physical assault will be addressed under this policy if it involves Sexual or Gender-Based Harassment, Intimate Partner Violence, or is part of a course of conduct under the Stalking definition.

35. Stalking

Stalking occurs when a person engages in a course of conduct directed at a specific person under circumstances that would cause a reasonable person to fear bodily injury or to experience substantial emotional distress.

Course of conduct means two or more acts, including but not limited to acts in which a person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property. Substantial emotional distress means significant mental suffering or anguish.

Stalking includes "cyber-stalking," a particular form of stalking in which a person uses electronic media, such as the internet, social networks, blogs, cell phones, texts, or other similar devices or forms of contact.

36. Sexual or Gender-Based Harassment

Sexual Harassment is any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when the conditions outlined in (a) and/or (b), below, are present. Harassment can be based on gender, sexual orientation, gender identity, or gender expression, and may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature, when the conditions outlined in (a) and/or (b), below, are present.

a. Submission to or rejection of such conduct is made, either explicitly or implicitly, a term or condition of a person's employment, academic standing, or participation in any University programs and/or activities or is used as the basis for University decisions affecting the individual (often referred to as "*quid pro quo*" harassment); or

b. Such conduct creates a hostile environment. A "hostile environment" exists when the conduct is sufficiently severe, pervasive, and objectively offensive that it unreasonably interferes with, limits, or deprives an individual from participating in or benefiting from the University's education or employment programs and/or activities. Conduct must be deemed severe, pervasive, and objectively offensive from both a subjective and an objective perspective. In evaluating whether a hostile environment exists, the University will consider the totality of known circumstances, including, but not limited to:

  i. The frequency, nature and severity of the conduct;
  ii. Whether the conduct was physically threatening;
  iii. The effect of the conduct on the Complainant's mental or emotional state;
  iv. Whether the conduct was directed at more than one person;
  v. Whether the conduct arose in the context of other discriminatory conduct;
  vi. Whether the conduct unreasonably interfered with the Complainant's educational or work performance and/or University programs or activities; and
  vii. Whether the conduct implicates concerns related to academic freedom or protected speech or is legitimate pedagogical design or delivery.

37. Retaliation  (Title IX complaint)  Acts of retaliation, intimidation, coercion against any person or group who is engaged in activity under this Code of Conduct, such as reporting a concern, acting as a witness, or otherwise participating in the investigation process, informal resolution process and/or Title IX process.

# VIII. RESPONSES AND CONSEQUENCES

## A. Consequences

Tulane University may choose to deliver the following consequences to students and/or student organizations. These consequences (some of which are sometimes referred to as *sanctions*), which may be delivered individually or in combination, include the following:

1. *Expulsion.*  Expulsion means that a student is removed from the Tulane University community permanently.  The expulsion will be noted on a student's transcript.

2. *Suspension.*  Suspension means that a student must leave the University for a definite or indefinite period.  A student may eventually return if applicable conditions are satisfied.  Suspensions do not appear on a transcript but are part of a student's educational record.

3. *Probation.*  Probation means that a student may remain at Tulane University, or an organization may continue to be recognized by the University, but may be required to satisfy specified conditions or requirements, or report regularly to a designated administrator.  Students may be barred from holding any office.  Students or organizations may be barred from participating in any activity in which the student or organization represents the University, including athletics or other competitive teams.  Students or organizations may lose their good standing during periods of probation.  Students may be barred from participating in any University recognized student organizations either within or outside the University community.  The sanction of probation may prohibit graduation until the period of probation has ended and the student has complied with all requirements.

4. *Withholding of Degree.*  Tulane University reserves the right to withhold a diploma pending completion of specific requirements.

5. *Educational Requirements.* Completion of projects, programs, or other such requirements designed for student development purposes.  This may include a variety of developmental, wellness or restorative programs for both individuals and organizations.

6. *Contact Restrictions.* Compliance with orders of no contact that limit access in time and space to specific University areas, including digital arenas, or forms of contact with particular persons or groups.

7. *Campus, Facility or Housing Restrictions.*  Exclusion from Tulane University housing or change in housing arrangements, including relocation.

8. *Community Service.*

9. *Written Warning or Reprimand.* Written warning giving the student or organization notice that any subsequent Code violations may carry more serious sanctions.

10. *Oral Warning or Reprimand.*  Oral warning giving the student or organization notice that any subsequent Code violations may carry more serious sanctions.

11. *Consequence Withheld.* In some situations, the imposition of certain consequences may be withheld conditioned upon a student's or organization's compliance with specified requirements.

12. *Loss of Privileges.*  For example, in some circumstances a student or organization may be restricted in the use of university facilities or from participation in activities, events or programs.

13. *Restitutions/Fines/Costs.* A student or organization may be required to compensate for damage to tangible or intangible property. In addition, Tulane University reserves the right to impose reasonable monetary fines.

14. *Referrals for assessment.* Tulane University may require a student to be assessed, seek counseling, or medical intervention.

15. *Revocation of Affiliation.*  Revocation of affiliation means that the student will no longer be permitted to be a member of a specific organization or that an organization will no longer be affiliated with Tulane University.

16. *Oral or Written Acknowledgement.*  A student or organization may receive an oral or written acknowledgment for good citizenship in following the core values and/or Code rules.

17. *Community workshops.*  This program teaches students how to be a good neighbor.

18. *Community Clean-ups.*  This allows students to directly improve the surrounded community by participating in organized clean-up efforts.

## B. Other Responses

1. Interim or Emergency Measures
In some instances, including but not limited to, alleged instances of sex discrimination, particularly sexual violence, it may be necessary and appropriate for Tulane University to implement what are known as emergency measures (a type of "consequence" not usually thought of as a "sanction") during an inquiry or investigation into the situation.

Interim or emergency measures are temporary actions taken by the University to ensure equal access to its education programs and activities and foster a more stable and safe environment during the process of reporting, investigation, and/or adjudication. Interim or emergency measures may be applied to persons reporting and/or responding (if any) and other involved individuals as appropriate to ensure their safety and well-being. Interim or emergency measures may be requested by students or employees, or the University at any time, regardless of whether any particular course of action is sought by the person bringing the initial report. Entities issuing interim or emergency

measures will assess the threat of safety to individuals or the greater community when making determinations.

Interim or emergency measures are initiated based on information gathered during a report and are not intended necessarily to be permanent resolutions; hence, they may be amended or withdrawn as additional information is gathered.

When a report of sex discrimination, such as sexual assault is received, the Title IX Coordinator, in consultation with other administrators as is appropriate, will impose reasonable and appropriate interim or emergency measures when necessary to protect the safety of the parties or witnesses involved per the Emergency Removal procedure described in Appendix A. The Director of Student Conduct or the Title IX Coordinator, in concert and/or consultation with other administrators as is appropriate, will be in contact with any and all persons impacted so that safety, and emotional and physical well-being concerns can be reasonably addressed.  The individual receiving the interim measure/s may submit an appeal to the Dean of Students for review within 24 hours of notification of the interim measure/s.

All individuals are encouraged to report concerns about the adequacy of the interim or emergency measures or failure of another individual to abide by any interim or emergency measure to the Director of Student Conduct and/or Title IX Coordinator. Violations of interim measures may result in consequences. The Director of Student Conduct and/or Title IX Coordinator will take appropriate, responsive, and prompt action to enforce interim measures and/or to respond to retaliation by another party or witness.

   2.Remedial Action
In some instances, when certain Code transgressions occur, it will be necessary for Tulane University to take *remedial action*—beyond simply punishing an individual for transgressions against the Code—for the benefit of an individual and/or the greater campus community.  Remedial actions are another form of consequences. These other "remedies" may result from rule transgressions, including certain forms of discrimination. These remedial actions may be restorative and/or facilitative.

The Office of Institutional Equity and/or the Title IX Coordinator will identify long-term or permanent remedies to address the effects of discrimination on persons impacted by that discrimination and address discriminatory impacts, if any, on the University community. The Office of Institutional Equity and/or the Title IX Coordinator will consider the appropriateness of remedies on an ongoing basis to assure the safety and well-being individuals impacted by discrimination throughout the process.  Long-term remedies may include extending or making permanent any emergency measures.  Many of the remedies and supports that an impacted individual might need will have already been provided as supportive measures, including but not limited to academic accommodations, short-term counseling, and housing arrangements.  The Office of

Institutional Equity and/or the Title IX Coordinator will consider whether there is a need for additional remedies.

# IX. RELATED POLICIES AND PRACTICES

The following is a non-exhaustive listing of related policies and procedures:

- Tulane University Alcohol & Other Drug Policy
http://campushealth-dev.tulane.edu/node/3126
- Tulane University Acceptable Use Policy
http://isowiki.tulane.edu/Tulane_Information_Security_Policies/Tulane_University_Acceptable_Use_Policy
- Tulane University Housing and Residence Life Community Living Standards
https://www2.tulane.edu/studentaffairs/housing/community-living/
- Tulane University Equal Opportunity/Anti-Discrimination Policy
http://www2.tulane.edu/equity/upload/EO-Policy-Revised-July-2016.pdf

# X. AMNESTY PROVISIONS

The Code of Student Conduct is intended to provide all students with the ability to participate in the student conduct process and to seek assistance from the University as needed. In order to encourage students to disclose all relevant information, the University reserves the discretion to refrain from taking disciplinary action against any individual (including a witness or a third party) who shares information in the interest of any individual's health and safety or in the interest of the Core Values set forth in this Code.  This includes, but is not limited to, amnesty for the consumption of alcohol or other drugs at or near the time of any incident. The University may require an educational conference where support, resources, and educational counseling options may be discussed and potentially required with a learning action plan for an individual who has engaged in the illegal or prohibited use of alcohol or drugs.  Amnesty may not be given if individuals or groups engage in deceptive behavior, have a significant delay in response or in any way endanger the safety of another.  The Dean of Students, or designee, has final say as to whether amnesty should apply.

# XI. PRIVACY, CONFIDENTIALITY, TRANSPARENCY, REPORTING AND RECORD-KEEPING

The Tulane Code is administered in compliance with the requirements of the Family Educational Rights and Privacy Act (FERPA), the Clery Act, Title IX, Violence Against Women Act (VAWA), state and local law, and Tulane University policies.

To respect a student's privacy in educational records we will typically share sensitive student information without a student's consent internally among administrators or other authorized individuals with a legitimate educational interest; or with others only with a student's consent. In unusual instances where there is a legitimate education/safety/wellness interest or requirement in doing so (or other situations where the law requires disclosure), we may disclose information to other individuals in special circumstances—such as an imminent risk of harm—without a student's consent.

The University is also committed to providing assistance to help students, employees and third parties make informed choices about when to share information and with whom.

Certain relationships are **confidential**, like the medical and clinical care providers at the Health Center for Student Care (and those who provide administrative services related to the provision of medical and clinical care at the Health Center), the mental health providers at CAPS, and ordained clergy, all of whom may engage in confidential communications under Louisiana law. In the context of these confidential relationships, information will typically not be revealed to any third party without permission except when an applicable law or a court order requires or permits disclosure of such information. However, confidential information may be disclosed when: (i) the individual gives written consent for its disclosure; (ii) there is a concern that the individual will likely cause serious physical harm to self or others; or (iii) the information concerns conduct involving suspected abuse or neglect of a minor under the age of 18.

Administrators receive training and guidance about sharing and safeguarding private information in accordance with state and federal law, including medical records. The confidentiality of a student's medical and related records generally is protected by Louisiana state medical privacy law and the Health Insurance Portability and Accountability Act ("HIPAA"), excepting health records protected by FERPA. To learn more about confidential reporting options at Tulane or in the New Orleans community, please visit https://allin.tulane.edu/get-help.

All other Tulane University employees, including faculty members, athletic coaches and trainers, and Student Affairs staff, **do not form confidential relationships with students.** These employees play the critical role of being individuals to whom a student (or employee) can turn to share information with the assurance that the information will get to Tulane University decision-makers for appropriate support and interventions.  An employee will report to the appropriate administrator (for instance in Title IX matters, the Title IX Coordinator) relevant details, obtained directly or indirectly for example, in an incident of discrimination that involves any student, the Responsible Employee will share information including dates, times, locations, and names of individuals impacted by discrimination and witnesses.)  Out of respect for free expression and the integrity of academic research, Responsible Employees are not required to

report information disclosed (1) at public awareness events (e.g., "Take Back the Night," candlelight vigils, protests, "survivor speak-outs" or other public forums in which students may disclose incidents); (2) during a student's participation as a subject in an Institutional Review Board-approved human subjects research protocol; or (3) in academic activities like classroom discussion or assignment.

Individuals may always choose to report any situation to the University, to law enforcement, to both, or to neither.  These reporting options are not exclusive. Where a crime may have been committed, an individual may simultaneously pursue criminal and disciplinary action. Tulane University will support individuals in understanding, assessing and pursuing these options. Tulane University balances the need for privacy and confidentiality with the value of *transparency*. Often this balancing results in the sharing of information in aggregate and/or redacted forms. Members of our community respect the often-delicate balancing required to protect all interests. Spreading false narratives, or sharing sensitive information improperly, can have a destructive impact on our educational environment and is not consistent with our core values. (Tulane University is often lawfully unable to correct false narratives in public forums or undo the damage caused by the release of sensitive information.) Tulane University cannot ensure that information will never be disclosed or obtained by others. *Our* record keeping procedures will be performed with due diligence and in compliance with the law and best practices in the field. Tulane University ordinarily maintains conduct records for seven years.

## XII. NOTICE OF EQUAL OPPORTUNITY AND ANTI-DISCRIMINATION

In keeping with Tulane's core values and as required by law, we provide the following notice of non-discrimination:

Tulane is committed to and encourages a diverse and inclusive community that respects and values individual differences. In support of this commitment, Tulane University prohibits discrimination and harassment in its employment practices or educational programs/activities on the basis of age, color, disability, gender expression, gender identity, genetic information, marital status, military status, national origin, pregnancy, race, religion, sex, sexual orientation, or veteran status, or any other status or classification protected by federal, state, or local law. Tulane University complies with applicable federal and state laws addressing Discrimination, Harassment, and/or Retaliation such as Titles VI and VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, the Age Discrimination in Employment Act, the Americans with Disabilities Act and ADA Amendments Act, and the Equal Pay Act.

Tulane University will promptly and equitably respond to all reports of discrimination and harassment in order to eliminate prohibited conduct, prevent its recurrence, and address its effects on an individual or the community.

Individuals must promptly report discrimination so prompt and appropriate action can be taken. Complaints of discrimination must be filed in accordance with the policies set forth below.

*Complaint Procedures:*
Promptly report Discrimination, Harassment, and/or Retaliation so appropriate action can be taken. The complaint procedures are designed to ensure the rights of the Complainant while at the same time affording due process to involved parties.

> *Form of Complaint*:
> Complaints of Discrimination, Harassment, and/or Retaliation will be accepted orally or in writing. Anonymous complaints will be accepted and investigated to the extent possible.  Complaints may be filed online at: Tulane.edu/concerns.

> *Content of Complaint:*
> Any individual who wants to report possible Discrimination, Harassment, or Retaliation based on a protected classification should promptly file a complaint with the following information, if known:  the name of the adversely affected party, a brief description of the offending behavior including times, locations, and name or identifying information about the accused, and the names or descriptions of any witnesses to the reported conduct.

> *Reporting the Complaint:*
> There is no time limit for reporting prohibited conduct to the University, however, the University's ability to respond may diminish over time as evidence may erode, memories may fade, and individuals may no longer be affiliated with the University. If the Respondent is no longer affiliated with the University, Tulane will provide reasonably appropriate remedial measures, assist the adversely affected party in identifying external reporting options, and take reasonable steps to eliminate prohibited conduct, prevent its recurrence, and remedy its effects. It is not necessary for an individual to confront the alleged harasser prior to instituting a complaint with the University. It is appropriate, however, to promptly report a complaint so that a thorough investigation is possible. Any person designated below to receive complaints from students, employees, or faculty must notify the Office of Institutional Equity within 24 hours of receiving a complaint.

> *Where to Report:* A student who wants to report possible Discrimination, Harassment, or Retaliation based on a protected status in violation of Tulane University policies must report the alleged behavior to one of the following:
> - Online at: Tulane.edu/concerns
> - Office of Institutional Equity, (504) 862-8083
> - Vice President for Student Affairs, (504) 314-2188

A Third-Party who wants to report possible Discrimination, Harassment, or Retaliation based on a protected status in violation of Tulane University policies must report the alleged behavior to one of the following:

- Office of Institutional Equity, (504) 862-8083
- On line at: Tulane.edu/concerns

*A Special Note About the Title IX Coordinator:*
The Title IX Coordinator oversees the University's centralized review, investigation, and resolution of reports of *sex discrimination, including Sexual Harassment and violence*. The Title IX Coordinator also coordinates the University's compliance with Title IX. The Title IX Coordinator can be contacted by telephone, email, or in person during regular office hours. Students, staff, and faculty may contact:

**Marcus Foster**
**Title IX Coordinator, Office of the Provost**
Tulane University
308 Jones Hall
New Orleans, LA 70118
TitleIX@tulane.edu
(504) 865-5611

Inquiries concerning the application of non-discrimination laws may be referred to the University officials listed above or to the Office for Civil Rights (OCR), United States Department of Education. A person may also file a complaint with the Department of Education's Office for Civil Rights regarding an alleged violation of Title IX by calling (800) 421-3481 or visiting: www2.ed.gov/about/offices/list/ocr/complaintintro.html. For further information about OCR and its jurisdiction, visit www2.ed.gov/about/offices/list/ocr/index.html or call 1-800-421-3481. To learn more about Title IX at Tulane, please visit our website at titleix.tulane.edu.

## XIII. EXTERNAL AGREEMENTS/DEFERENCE TO EXTERNAL LEGAL AUTHORITIES

Tulane University does not enforce external agreements with this Code. Tulane University will defer to the directives of valid external legal authorities when legally required to do so, and reserves the right to defer to external legal authorities when not otherwise legally required to do so.

## XIV. INTERPRETATION OF THE CODE

The Tulane Code is designed to be self-explanatory. Should a disagreement over interpretation arise, exclusive authority to interpret the Tulane Code lies within the authority and discretion of

Vice President for Student Affairs or designee and any such interpretations are final and unreviewable.

## XV. REVISION OF CODE*

The Code of Student Conduct should be reviewed by the Vice President of Student Affairs and/or the designee on an annual basis. All proposed revisions must first go before the Committee on the Code of Student Conduct and/or faculty senate student affairs subcommittee, which shall determine whether the proposed revisions are minor or substantive. This Committee will fall under the purview of the Vice President for Student Affairs, or their designee, and shall be compromised of at least one faulty member, at least one staff member and at least one student member. The Student Conduct Administrator shall serve as the non-voting chair. This committee shall convene whenever there is a proposed revision of the Code of Student Conduct, and its sole role will be to determine whether the proposed revision is minor or substantive. A minor change is defined as any change that does not affect the intent, workings, or procedures of the conduct process or that is require by federal, state or local law or regulation. Such minor changes, as determined by the committee, can be made by the Student Conduct Administrator and the Vice President for Student Affairs based on agreement by both with final approval by the Provost. A substantive change, as determined by the committee, is defined as a change that affects the conduct process or students' rights unless it is required by federal, state, or local law or regulation. The revision process for substantive changes is as follows:

A. The proposed changes are vetted among staff, students, and faculty internal to the conduct process, General Counsel, Provost Staff, Student Affairs senior leadership, and the Student Affairs Committee of the Senate (SACS).

B. SACS reviews and makes recommendations to the University Senate with respect to the proposed changes.

C. The University Senate reviews and acts on the SACS recommendations.

D. The action of the University Senate is forwarded to the Provost for review.

E. The Provost forwards with comment the record of SACS recommendations and University Senate actions to the President's cabinet.

F. Final approval of proposed substantive revisions to the Code resides with the President's cabinet.

\* The process described in this section shall not apply to revisions of the Code necessitated by changes in the law or for purposes of legal compliance; such changes may be made at the University's sole discretion.

# XVI. THE IMPORTANT ROLE OF FAMILIES

The University may facilitate communication between the University and families in support of student success. Families can contribute best to student success when they are aware of the challenges and opportunities facing today's students.  Higher education has evolved significantly in the last few decades, even in the last few years.  A family's prior experience in higher education may or may not be equivalent to what students will face today.

We encourage parents and families to learn about Tulane University's student support services and understand how their students can access these resources.  Families are encouraged to discuss and embrace Tulane University's  Core Values with their student.

When a student is enrolled at Tulane University, you can expect us to:

- Challenge students to identify, define, and solve problems independently
- Encourage students to set and achieve personal goals and make responsible decisions related to academics, career planning, social interactions, and community engagement
- Understand and support Tulane University's commitment to academic excellence
- Empower students to examine personal values
- Encourage students to learn about and respect the values and beliefs of others
- Expect students to accept consequences of their actions and responsibility for their choices
- Urge students to proactively and constructively examine undesirable or undesired outcomes in order to assess what caused them, what can be done about them, and how to avoid them in the future
- Make reasonable efforts to create a safe and inclusive living and learning environment for all

If you are ever concerned about your student's wellness in any way, please contact appropriate campus or community authorities immediately:

- Student Resources and Support Services   (504) 314-2160
- Counseling and Psychological Services  (504) 314-2277
- Tulane University Police Department  (504) 988-5381

Please be aware that Tulane University may contact and involve families in order to gain assistance from parents when students under the age of 21 have an alcohol or drug violation or if they are engaged in other behaviors that pose health or safety risks to themselves or other students. We also want to remind families that there are federal laws (for example the Federal Educational Rights and Privacy Act of 1974 and the Health Insurance Portability and Accountability Act of 1996) that place limitations on parents' ability to access student records. Please contact the Office of Student Conduct at conduct@tulane.edu if you have questions about these limitations and how we can still partner and appropriately communicate with you to promote the success of your student.

Please remember that you are also free to share information with us.  For instance, we often find it helpful when a student or their family discloses challenges that a student had prior to matriculation, or any special needs.

## XVII. NOTIFICATION OF ARREST

Students are required to notify the university if they have been arrested, charged or convicted for any Clery crime.  Clery crimes include murder/non-negligent manslaughter; negligent manslaughter; rape; fondling; incest; statutory rape; dating and domestic violence (intimate partner violence); stalking; robbery; aggravated assault; burglary; motor vehicle theft; arson; alcohol, drug or weapons offenses; and hate crimes (related to any of the above or intimidation, destruction of property/vandalism, larceny/theft or simple assault).  Students should submit this information to the Dean of Students Office or the Office of Student Conduct.

# Appendix A:

# Amendment to the Code of Student Conduct Regarding Title IX Sexual Harassment

## *Purpose of Appendix*

Title IX of the Education Amendments Act of 1972 states:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance.

The purpose of this Appendix is to articulate Tulane University's response to allegations of Sexual Harassment consistent with Title IX, specifically the May 2020 amendments to the Title IX regulations regarding Sexual Harassment. This Appendix is focused specifically on Sexual Harassment, which includes sexual violence, as defined by Title IX in those regulatory amendments.  The Appendix is not intended to govern those instances where this Code otherwise has jurisdiction. This Appendix further explains the relationship between the Title IX complaint and grievance procedures and the University's complaint and resolution processes for non-Title IX Sexual Harassment prohibited by the Code of Student Conduct. The Appendix also details the University's grievance procedures in which Complainants and Respondents are treated equitably. Equitable treatment is ensured by providing remedies to a Complainant when a determination of responsibility for Sexual Harassment has been made against the Respondent, and by following a grievance process that complies with the process proscribed by the Title IX regulations.

The policy and procedures for other forms of sexual discrimination under Title IX are still articulated in the Tulane University Equal Opportunity & Anti-Discrimination Policy.

The compliance requirements mandated by the Department of Education are complicated, and the interaction between Title IX and non-Title IX Sexual Harassment can seem complex. We acknowledge that this is potentially a complicated and intimidating process, in particular for students. That can be magnified if a student is impacted by trauma, stress, or emotions. Tulane has information about support options, both confidential and private, available at the University and in the community available at the *All In* website.

We also strongly encourage all individuals who have questions about the information in this Appendix to please contact the Title IX Coordinator or Deputy Title IX Coordinators listed in the Title IX Coordinator section. The Office of Student Conduct (Student Conduct) can answer any questions regarding the student resolution options through either Alternative Resolution Options or the Formal Grievance Procedure; Case Management & Victim

Support Services (CMVSS) can answer any questions regarding Supportive Measures available to student Complainants and Respondents. The Office of Institutional Equity (OIE) can answer any questions regarding employee Supportive Measures and grievance procedures under Title IX or Title VII.

## *Implementation*

The definitions and processes described in this Appendix take effect on August 14, 2020. This does not retroactively apply to cases that were resolved prior to the implementation date. If investigations are in progress at the time of implementation, the policies and procedures that were in place at the time the investigation began will continue forward in its current process. If a person makes a complaint after this policy is implemented about an incident(s) that occurred prior to August 14, 2020, the procedures articulated in this policy will apply while the definitions of sexual misconduct will come from the policies that were in effect at the time of the incident.

At the time of this policy's update in July 2021, the Title IX regulations are under legal challenge and government review; if there is a change in the regulatory obligations or how Tulane should be compliant with Title IX, the University will reevaluate the applicability of this policy and its associated procedures.

## *Sexual Harassment Defined*

A.  *Sexual Harassment* includes two distinct but overlapping definitions:

1. The Title IX regulations define Sexual Harassment as conduct on the basis of sex that must satisfy one or more of the following:
   a. A Tulane employee conditions the provision of an aid, benefit, or service of Tulane on an individual's participating in unwelcome sexual conduct; or
   b. Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to Tulane's education program or activity; or
   c. Sexual Assault, Dating Violence, Domestic Violence, and Stalking, as defined in Section III, Parts B, C, D, and E below.

Student conduct that meets this definition must be resolved using the Title IX Grievance Procedures articulated in this Appendix in Part VIII below.

2. In addition, consistent with Title VII of the Civil Rights Act of 1964 and the recognition that Sexual Harassment may also occur in a wider variety of contexts, Tulane also defines Sexual Harassment to include any unwelcome sexual advance, request for sexual favors, or other

unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, electronic, or otherwise (*Sexual Harassment*); or, any act of intimidation or hostility, whether verbal or non-verbal, graphic, physical, or otherwise based on sex or gender, sexual orientation, gender identity, or gender expression, even if the acts do not involve conduct of a sexual nature (*gender-based harassment*); when one or more of the following conditions are present:

a. Submission to or rejection of such conduct is either an explicit or implicit term or condition of, or is used as the basis for decisions affecting, an individual's employment or advancement in employment, evaluation of academic work or advancement in an academic program, or basis for participation in any aspect of a Tulane program or activity (*quid pro quo*); or

b. The conduct is sufficiently severe, pervasive, or persistent that it has the purpose or effect of unreasonably interfering with, limiting or depriving an individual from participating in or benefiting from Tulane's learning, working, or residential programs under both an objective and subjective standard (*hostile environment*).

In evaluating whether a hostile environment exists, Tulane will evaluate the totality of known circumstances, including, but not limited to:

i. the frequency, nature and severity of the conduct;
ii. whether the conduct was physically threatening;
iii. the effect of the conduct on the Complainant's mental or emotional state;
iv. whether the conduct was directed at more than one person;
v. whether the conduct arose in the context of other discriminatory conduct;
vi. whether the conduct unreasonably interfered with the Complainant's educational or work performance and/or Tulane programs or activities;
vii. whether the conduct implicates academic freedom or protected speech; and,
viii. other relevant factors that may arise from consideration of the reported facts and circumstances.

Student conduct that does not meet the Title IX definition of Sexual Harassment but meets this second definition will be resolved using the procedures articulated in the Code in Part E. Investigation of Major Matters (non-Title IX)

B. *Sexual Assault* is having or attempting to have sexual contact with another individual without consent or where the individual cannot consent because of age or temporary or permanent mental incapacity.

1. Sexual contact includes:
   a. sexual intercourse (anal, oral, or vaginal), including penetration with a body part (e.g., penis, finger, hand, or tongue) or an object, or requiring another to penetrate themselves with a body part or an object, however slight;
   b. sexual touching of the private body parts, including, but not limited to, contact with the breasts, buttocks, groin, genitals, or other intimate part of an individual's body for the purpose of sexual gratification; and
   c. attempts to commit sexual assault.

2. Consent
   a. Consent is defined as being:
      1. informed (knowing);
      2. voluntary (freely given); and
      3. active (not passive), meaning that, through the demonstration of clear words or actions, a person has indicated permission to engage in mutually agreed-upon sexual activity.

   b. Consent cannot be obtained by Force. Force includes: the use of physical violence, threats, intimidation, and/or coercion.
      1. Physical violence means that a person is exerting control over another person through the use of physical force. Examples of physical violence include hitting, punching, slapping, kicking, restraining, choking, and brandishing or using any weapon.
      2. Threats are words or actions that would compel a reasonable person to engage in unwanted sexual activity. Examples include threats to harm a person physically, to reveal private information to harm a person's reputation, or to cause a person academic or economic harm.
      3. Intimidation is an implied threat that menaces or causes reasonable fear in another person. A person's size, alone, does not constitute intimidation; however, a person's size may be used in a way that constitutes intimidation (e.g., blocking access to an exit).
      4. Coercion is the use of an unreasonable amount of pressure to gain sexual access. Coercion is more than an

effort to persuade, entice, or attract another person to have sex. When a person makes clear a decision not to participate in a particular form of Sexual Contact or Sexual Intercourse, a decision to stop, or a decision not to go beyond a certain sexual interaction, continued pressure can be coercive. In evaluating whether coercion was used, the University will consider:

    A. the frequency of the application of the pressure,

    B. the intensity of the pressure,

    C. the degree of isolation of the person being pressured, and

    D. the duration of the pressure.

c. Consent cannot be gained by taking advantage of the incapacitation of another, where the person initiating sexual activity knew or reasonably should have known that the other was incapacitated. Incapacitation means that a person lacks the ability to make informed, rational judgments about whether or not to engage in sexual activity. A person who is incapacitated is unable, temporarily or permanently, to give Consent because of mental or physical helplessness, sleep, unconsciousness, or lack of awareness that sexual activity is taking place. A person may be incapacitated as a result of the consumption of alcohol or other drugs, or due to a temporary or permanent physical or mental health condition.

d. Being impaired by alcohol or other drugs is not a defense to not obtaining consent.

The statutory definition of sexual assault referenced by the Title IX regulations also includes having or attempting to have sexual contact between persons who are related to each other within the degrees where marriage is prohibited by law.

C. *Dating Violence* is violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the Complainant. The existence of such a relationship shall be determined based on the Complainant's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship.

D. *Domestic Violence* includes felony or misdemeanor crimes committed by a current or former spouse or intimate partner of the victim under the family or domestic violence laws of the jurisdiction and includes the use or attempted

use of physical abuse or sexual abuse, or a pattern of any other coercive behavior committed, enabled, or solicited to gain or maintain power and control over a victim, including verbal, psychological, economic, or technological abuse that may or may not constitute criminal behavior, by a person who—

1. is a current or former spouse or intimate partner of the victim, or person similarly situated to a spouse of the victim;

2. is cohabitating, or has cohabitated, with the victim as a spouse or intimate partner;

3. shares a child in common with the victim; or

4. commits acts against a youth or adult victim who is protected from those acts under the family or domestic violence laws of the jurisdiction.

E. *Stalking* is engaging in a course of conduct directed at a specific person that would cause a reasonable person to fear for the person's safety or the safety of others or suffer substantial emotional distress.
   1. Course of conduct means two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.
   2. Reasonable person means a reasonable person under similar circumstances and with similar identities to the Complainant.
   3. Substantial emotional distress means significant mental suffering or anguish that may, but does not necessarily require, medical or other professional treatment or counseling.

## Resources and Reporting

*Choosing to disclose*
Choosing to disclose Sexual Harassment, let alone file a Formal Complaint to initiate a Grievance Procedure, is a personal decision. Tulane wants to ensure that students are well informed and supported in their decision to disclose and in their decisions around participating in a Grievance Procedure. Tulane has amassed a list of trained resources available to provide support and guidance thorough the initiation, investigation, and resolution of a report of Title IX Sexual Harassment as well as any other sexual misconduct at the *All In* website.

Any individual who is uncertain what they wish to do in response to an alleged incident of Sexual Harassment, including how or whether to report the conduct, is encouraged to contact and consult a Confidential Resource to address questions and concerns in a confidential setting. The *All In* website also has a list of Confidential Resources at Tulane and in the New Orleans community and nationally that students may turn to instead of the University.

Students may choose to either disclose incidents of Sexual Harassment and violence in a Report directly to the Title IX Coordinator or other designated response offices; or to any other non-confidential employee at Tulane. Either route a student chooses will lead to prompt outreach from CMVSS.

*Direct Reporting to Tulane*
A Report is any official notification made to the Title IX Coordinator regarding incidents that implicate Title IX. **A Report is not the same as a Formal Complaint to initiate the Title IX Grievance Procedures.**

Individuals with questions or concerns about Tulane's processes may also contact the Title IX Coordinator directly as part of reporting an incident to Tulane. Any individual may make a report of Sexual Harassment under this policy regardless of affiliation with Tulane and regardless of whether or not the person reporting is the person alleged to be the victim of conduct. Reports can be made via the university's centralized online Concerns Form, found at tulane.edu/concerns and is available 7 days a week, 24 hours a day, 365 days a year. Additionally, reports can be made in person or via Zoom, by mail, by telephone, or by electronic mail, using the contact information listed for the Title IX Coordinator, or by any other means that results in the Title IX Coordinator receiving the person's verbal or written report. A report may be made at any time (including during non-business hours) by using the telephone number or electronic mail address, or by mail to the office address, listed for the Title IX Coordinator here:

Tulane has designated Marcus Foster the University's Title IX Coordinator; he can be contacted at (504) 865-5611 or TitleIX@tulane.edu; mail can be sent to 308 Jones Hall, 6832 St. Charles Avenue, New Orleans LA, 70118.

Tulane has also designated Ruth Riley, Erica Woodley, and Julia Broussard as Deputy Title IX Coordinators.

Reports made to the Title IX Coordinator involving students are protected by the Family Education Right to Privacy Act (FERPA) and are not shared with anyone without a need to know to enact Supportive Measures or coordinate other forms of care and response.

Individuals may also report to those at Tulane who are designated with the authority to institute corrective measures on behalf of the University. The University has designated the staff in the following offices as those who can institute corrective measures on half of the

University as these are the first-line responding employees to issues of sexual discrimination, harassment, and violence on campus: the Office of Student Conduct, the Office of Institutional Equity, those individuals serving in the Student Affairs Professional On Call rotation, the Tulane University Police Department, and the Office of Case Management & Victim Support Services. These offices will receive a Report from an individual and notify the Title IX Coordinator.

*Title IX Care Connections by Employees*
To fulfill their mandate to share information as stated in Part V of the Equal Opportunity & Anti-Discrimination Policy, Employees (including Resident Assistants) who are not confidential are required to make a "Care Connection" via the Tulane Concerns Form (tulane.edu/concerns) so the University may make supportive outreach to any known impacted individuals. Supportive outreach for students comes from the Office of Case Management & Victim Support Services (CMVSS); supportive outreach for employees comes from the Office of Institutional Equity (OIE). The Title IX Coordinator is copied on Care Connections and will gatekeep whether the incident falls within Title IX or not (as outlined in the Title IX section of the Code) so that CMVSS/OIE may fully discuss which (if any) University resolution processes are available to Complainants.

Supportive outreach is offered to all students and employees, regardless if the incident falls within the jurisdiction of Title IX or the Code of Student Conduct. Students can decline to meet with CMVSS about the incident in the Care Connection. If student declines to meet, they will receive an email outlining options for support if the student would need assistance in the future.

**Exceptions**: Faculty are not required to make a Care Connection in response to disclosures made within the academic context, namely within classroom discussion or activities or in assignments (e.g., class journals, essays, creative nonfiction, etc.). If a faculty member is unsure if a disclosure should be excepted or not, please contact the Title IX Coordinator. Note that while faculty members do not need to share forward disclosures in the academic context, they can still choose to do so if they feel it is appropriate to connect a student to care and support.

Please go to the All In website to learn more about the Employee Care Connection requirement, including syllabus language on Title IX, explanation videos, and further training on how to best respond to student disclosures of sexual harassment and violence.

*Retaliation and Privacy Protections*
In addition to the prohibition on Retaliation found in the Code of Student Conduct, neither Tulane nor any person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by Title IX, or because the individual has made a Report or Formal Complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part. Intimidation, threats, coercion, or discrimination for the purpose of interfering with any right or privilege secured by Title IX, constitutes retaliation. This includes charges against an individual for other conduct violations that do not involve sex discrimination or Sexual Harassment

but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a Report or Formal Complaint of Sexual Harassment.

Amnesty Provisions

The Code of Student Conduct is intended to provide all students with the ability to participate in the student conduct process and to seek assistance from the University as needed. In order to encourage students to disclose all relevant information, the University reserves the discretion to refrain from taking disciplinary action against any individual (including a witness or a third party) who shares information in the interest of any individual's health and safety or in the interest of the Core Values set forth in this Code.  This includes, but is not limited to, amnesty for the consumption of alcohol or other drugs at or near the time of any incident. The University may require an educational conference where support, resources, and educational counseling options may be discussed and potentially required with a learning action plan for an individual who has engaged in the illegal or prohibited use of alcohol or drugs.  Amnesty may not be given if individuals or groups engage in deceptive behavior, have a significant delay in response or in any way endanger the safety of another.  The Dean of Students, or designee, has final say as to whether amnesty should apply.

## *Supportive Measures and Emergency Removals*

*Supportive Measures*

Supportive Measures are individualized services offered to Complainants and Respondents that are offered as appropriate and reasonably available to restore or preserve equal access to Tulane's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or Tulane's educational environment, or deter Sexual Harassment. Supportive Measures are available regardless of whether a Complainant wants to move forward with a Formal Complaint.

When Tulane has notice of potential Title IX Sexual Harassment, the University will inform the Complainant of the availability of Supportive Measures with or without the filing of a Formal Complaint and explain to the Complainant the process for filing a Formal Complaint.

Supportive Measures are non-disciplinary, non-punitive individualized measures offered as appropriate, as reasonably available and without fee or charge to the Complainant or Respondent. They may include:

- Access to counseling services and assistance in setting up initial appointments, both on and off campus
- Imposition of mutual Contact Restriction, also known as a No Contact Order
- Rescheduling of exams and assignments

- Providing alternative course completion options
- Change in class schedule, including the ability to drop a course without penalty or to transfer sections
- Change in on-campus work schedule or job assignment
- Change in student's campus housing, as reasonably available
- Assistance from University support staff in exploring alternative housing options
- Access modifications to certain University facilities or activities pending resolution of the matter
- Voluntary leave of absence
- Providing an escort to assure safe movement on-campus between classes and activities
- Arranging for medical services
- Providing academic support services, such as tutoring

Tulane will consider a number of factors in determining which Supportive Measures to take, including the needs of the student seeking Supportive Measures; the severity or pervasiveness of the alleged conduct; any continuing effects on the Complainant; whether the Complainant and the Respondent share the same residence hall, academic course(s), or on-campus job location(s); and whether judicial measures have been taken to protect the Complainant (e.g., protective orders). Tulane will work in good faith to implement the requirements of judicially issued protective orders and similar orders, to the extent that doing so is within its authority.

The Title IX Coordinator has designated the office of Case Management & Victim Support Services (CMVSS) within the Division of Student Affairs to administer the offer and implementation of Supportive Measures for student Complainants and Respondents.

The Title IX Coordinator is responsible for ensuring the implementation of Supportive Measures. To that end, if a student feels as though they have been denied a reasonable Supportive Measure by CMVSS, they may file an appeal with the Title IX Coordinator.

Tulane will maintain the privacy of any Supportive Measures provided under this Appendix to the extent practicable and will promptly address any violation of protective measures.

The process for offering and implementing Supportive Measures to students and related other individuals is as follows:

Complainants. Upon receipt of a student disclosure of sexual misconduct, regardless of whether it falls within Title IX, CMVSS will promptly contact the complainant and invite them to speak with a case manager to discuss the availability of supportive measures, consider the complainant's wishes with respect to supportive measures, inform the complainant of the availability of supportive measures with or without the filing of a formal complaint, and explain to the complainant the process for filing a formal complaint. Complainants who either wish to or file a formal complaint with the university but have their complaints dismissed because

of one of the reasons explained in the Dismissal section may be able to pursue conduct action through the Code of Student Conduct or Equal Opportunity & Anti-Discrimination Policy; complainants will be informed of that option, as well as their option to appeal a complaint's dismissal. In addition to an in-person meeting, Tulane will provide the Complainant with written information about resources, procedural options, and reasonably available Supportive Measures. This written information shall include a notification about the process for seeking disability-based accommodations, academic adjustments, and/or auxiliary aids under Section 504 of the Rehabilitation Act and/or the Americans with Disabilities Act.

Respondents. Once a student has been named in a formal complaint and/or received notice that they are a respondent in a Title IX matter, CMVSS will contact the Respondent and invite them to speak with a case manager to learn about supportive measures available and the Title IX grievance procedure.

Third Parties. Tulane will also provide Supportive Measures for Third Parties, provided that the Supportive Measures are within the scope of that individual's relationship to Tulane and are reasonably available.

*Emergency Removal*
Based on the information in a Report, or information subsequently learned, the University may remove a Respondent from Tulane's education program or activity (including placing a non-student employee Respondent on administrative leave during the grievance process) on an emergency basis.

An Emergency Removal requires that the University undertake an individualized safety and risk analysis and then determine if a removal is warranted due to an immediate threat to the physical health or safety of any student or other individual arising from the allegations of Sexual Harassment. This analysis will be conducted by the University's Behavioral Intervention Team with a final determination regarding removal made by a Deputy Title IX Coordinator (either the Deputy for Students or Deputy for Employees, depending on the Respondent's identity). The Respondent will be notified in writing as to the determination and reasoning for the removal decision; this notice will also detail how the Respondent can choose to file an appeal immediately following the removal. All emergency removal appeals will be heard by the Title IX Coordinator within thirty-six (36) hours of submission and a decision returned in writing to the Respondent.

If the removal directly relates to the Complainant, the Complainant will be notified if a Respondent has been subjected to an Emergency Removal and the outcome of any appeals the Respondent files to challenge their removal. If the Respondent files an appeal to a removal decision, the Complainant will have twenty-four (24) hours to provide information for consideration of the appeal. Removals will be re-evaluated on a weekly basis by the Behavioral Intervention Team.

## *Filing a Formal Complaint*

When a Complainant is contacted following either a Report of Sexual Harassment or a Care Connection, along with the information about Supportive Measures, Complainants are provided information on filing a Formal Complaint to initiate a Title IX resolution process: either an informal Alternative Resolution Option or the formal Title IX Grievance Procedure. A signed Formal Complaint is required to initiate any Title IX resolution process where a binding decision can be issued (whether informal Alternative Resolution or the formal Title IX Grievance Process.

A Formal Complaint is a document submitted to the Title IX Coordinator by the Complainant alleging that a Respondent engaged in Prohibited Conduct and requesting an investigation. The preferred format to submit a Formal Complaint is online at https://cm.maxient.com/reportingform.php?TulaneUniv&layout_id=23. However, it may be submitted to the Title IX Coordinator in person, by mail, or by electronic mail as well.  The Complainant may also contact the Title IX Coordinator directly for assistance.

Additionally, a Report may allege certain facts that compel Tulane to continue forward with an investigation if not file a Formal Complaint despite the Complainant choosing not to sign a Formal Complaint. Such circumstances may be present where a risk of imminent harm to an individual or others or a threat to the physical health and safety of the campus is determined to exist. After an evaluation of the available information, if such circumstances are present, a Formal Complaints can be filed and signed by the Title IX Coordinator to continue the resolution process. If a Formal Complaint is initiated without the Complainant's participation, the Complainant will be notified and given an explanation of why the University is compelled to continue. Absent such extraordinary circumstances, the University will not proceed with its Formal Grievance Procedure without a participating Complainant.

Tulane may consolidate Formal Complaints against more than one Respondent, or by more than one Complainant against one or more Respondents, or by one party against the other party, where the allegations of Prohibited Conduct arise out of the same facts or circumstances.

## *Determining if Title IX Applies*

Reports of potential sexual discrimination, harassment, or violence are routed to the Title IX Coordinator and to Case Management and Victim Support Services (CMVSS) to initiate the University's response. While CMVSS makes supportive outreach in the manner explained in the above section, the Title IX Coordinator conducts a gatekeeping evaluation of the Report to determine whether it falls within the bounds of Title IX. This gatekeeping evaluation occurs whether a Formal Complaint has been filed or not, and students will be informed whether their allegations fall within the jurisdiction of Title IX in the initial supportive outreach meeting and/or before filing a Formal Complaint whenever possible.

The Title IX Coordinator or designee will be responsible for determining whether the reported conduct falls within Title IX jurisdiction as defined by the Title IX regulations. If so, Tulane may move forward with a filed Formal Complaint process as described in the previous section. If not, Tulane may be required to dismiss any Formal Complaint. The Title IX Coordinator will evaluate reasonably available information to make the following determinations:

1. Did the reported conduct occur within Tulane's Education Program or Activity? This must be answered in three parts:
   a. Does Tulane have substantial control over the Respondent? *And*,
   b. Does Tulane have substantial control over the context in which the conduct is reported to have occurred; or did the conduct occur in a building owned or controlled by a student organization that is officially recognized by Tulane? *And,*
   c. Is the Complainant currently participating or attempting to participate in a Tulane Education Program or Activity?

2. Did the reported conduct occur in the United States?

3. Would the facts set forth by the report, if substantiated, constitute a violation of Sexual Harassment as defined by the Title IX regulations in Section III of this Appendix?

Based on the answers to these questions, the Title IX Coordinator will make a determination about scope and process. This is a threshold determination regarding scope and jurisdiction, which will determine appropriate next steps as follows:

- Where the answer to these three questions is ***yes***, and a Formal Complaint is filed, Tulane will follow the formal Grievance Procedure required by the Title IX regulations and articulated in Section F of the Code of Student Conduct above. The Title IX Grievance Process includes a hearing with cross-examination by each parties' advisors, different evidence rules, and limitations on the use of statements that have not been subject to cross-examination. The hearing will allow the participants to simultaneously see and hear each other but may be conducted remotely through videoconferencing technology.

- Where the answer to any of these three questions is ***no***, and a Formal Complaint has been filed, Tulane will dismiss the allegations in the Formal Complaint related to Sexual Harassment as defined in the Title IX regulations in Section III of the Appendix.

If there are additional allegations of sexual misconduct in the Formal Complaint, Tulane will proceed with a formal resolution process for any

other allegations that, if true, may constitute prohibited conduct outside of the Title IX regulations. That process is described in Section E of the Code above.

The Title IX Coordinator or designee will provide written notice of the determination as to scope and jurisdiction to the Complainant or Reporting Party, refer that individual to the appropriate resources, including local law enforcement resources as applicable, and provide reasonably available Supportive Measures.

In the event a Respondent is charged with a violation of an applicable conduct code that is related to the report of Sexual Harassment, Student Conduct may also investigate and resolve the related conduct charge. If the Respondent is charged with a violation of another Tulane policy that is unrelated to the alleged violation of Title IX Sexual Harassment, Student Conduct shall coordinate its investigation and resolution as appropriate with any such investigation or resolution under the other applicable Tulane policy.

## *Appeals of the Dismissal of Formal Complaints*

If a Complainant or Respondent would like to appeal the Title IX Coordinator's decision to dismiss a Formal Complaint, they may submit an appeal to the Senior Vice President for Academic Affairs and Provost or their designee within one week of receiving the dismissal. The other party will be notified about the filing of the appeal and will then have one week to provide information for consideration of the appeal. The Provost will return a decision on the appeal within one week of receiving all information, notifying both parties simultaneously of the outcome.

## *Title IX Grievance Procedure: Investigation, Hearing, Outcomes,Appeal*

The investigation of Title IX Sexual Harassment matters is dictated by the May 2020 Amendments to the Title IX Federal Regulations (34 C.F.R. part 106) and rests on the processdescribed in the Code as well as the additional procedural requirements outlined here. The University is committed to providing a prompt and impartial investigation and adjudication ofall Formal Complaints alleging violations of this policy. During the Grievance Process, both parties (Complainant and Respondent) have equal rights to participate.

## *Presumptions of Good Faith and Non-Responsibility*

The University presumes that reports of prohibited conduct are made in good faith. A finding that the alleged behavior does not constitute a violation of this policy or that there is insufficient evidence to establish that the alleged conduct occurred as reported does not meanthat the report was made in bad faith. Further, Tulane makes no determinations as to the outcome of an allegation until the completion of an investigation; this includes a presumption that the Respondent is not responsible for the alleged conduct until a determination regardingresponsibility is made at the conclusion of the grievance process.

In all proceedings under this policy, including at the hearing, the complainant, the respondent,and the witnesses and other individuals sharing information are expected to provide truthful information.

## *Advisors*

Throughout the Grievance Process, each party may have an Advisor of their choice; parties maychange their advisor at any time during the Grievance Process. An Advisor is an individual chosen by a Complainant or a Respondent to provide guidance during the grievance process. Anadvisor may be a member or non-member of the University community and may be an attorney.

The role of the advisor is narrow in scope: the Advisor may attend any interview or meetingconnected with the Grievance Process, but the Advisor may not actively participate in interviews and may not serve as a proxy for the party, including in communications to the University. The Advisor may attend the hearing and may conduct cross-examination of the other party and any witnesses at the hearing; otherwise, the Advisor may not actively participate in the hearing.

If a party does not have an Advisor present at the hearing to conduct cross examination, the University will provide without fee or charge to that party an advisor selected by the University(who may be, but is not required to be, an attorney) to conduct cross-examination of the otherparty and/or any witnesses.

Any individual who serves as an advisor is expected to make themselves available for meetings and interviews throughout the investigation process, as well as the hearing, as scheduled by theUniversity. The University (including any official acting on behalf of the University such as an investigator or a hearing panelist) has the right at all times to determine what constitutes

appropriate behavior on the part of an advisor and to take appropriate steps to ensurecompliance with this policy.

Tulane allows Complainants and Respondents to appoint an additional *support person* of their choice to attend the live hearing. This support person also has no formal role in the process and may not actively participate in the hearing (including speaking) in any way. Advisors are concerned with ensuring that students are able to respond to the information presented in the hearing; a support person is concerned only with the student and their wellbeing during what can be a stressful and emotional procedure. The University (including any official acting on behalf of the University such as an investigator or a hearing panelist) has the right at all times to determine what constitutes appropriate behavior on the part of an advisor and to take appropriate steps to ensure compliance with this policy.

### *Procedural Review*

A Procedural Review is an informational meeting where the Director of Student Conduct  overviews Tulane's investigation and adjudication procedures.

A Procedural Review can happen before or after a Formal Complaint has been filed. Having a Procedural Review does not initiate the conduct process unless a Complainant expressly states they want to initiate that process; in Title IX matters, the conduct process cannot be initiated without a signed Formal Complaint. While a Complainant can file a Formal Complaint without having a Procedural Review first, it is strongly encouraged. Complainants will be given the information to file a Formal Complaint following their Procedural Review. If a Formal Complaint is filed before a Procedural Review, one will be scheduled promptly. Respondents will be contacted for a Procedural Review following the notice of investigation.

Procedural Reviews are available for all conduct cases, not just Title IX Sexual Harassment, and for Complainants and Respondents. During the Procedural Review, students will learn about the conduct investigation process in detail, including all rights, privileges, and responsibilities.

Students will also learn about the available Supportive Measures in place to help students navigate this process. Students will also learn details about communication and timeline. Students will receive a written summary of the meeting for their reference. Advisors may also join students in this meeting.

## Informal Resolution Process

Subject to the consent of the parties and the approval of the University Sexual Misconduct/Title IX Coordinator, the University permits informal resolution processes in cases in which a formal complaint has been filed with the University Sexual

Misconduct/Title IX Coordinator. Subject to approval by the University Sexual Misconduct/Title IX Coordinator, the informal resolution process is available in matters involving a student complainant and a student respondent aswell as in matters involving a faculty/staff complainant and a faculty/staff respondent; the informal resolution process is not available in matters involving a student and an employee.

The informal resolution process is a voluntary, remedies-based process designed to provide parties with an option to resolve disputes with other students in a forum that is separate and distinct from the University's formal grievance processes under the Title IX Sexual Harassment policy. The purpose of the informal resolution process is to address the conduct which has beenreported by the complainant and place the parties in a position to pursue their academic and non-academic interests in a safe, respectful, and productive educational and working environment. Under this process, there will be no disciplinary action taken against a respondent, and the resolution will not appear on the respondent's disciplinary record.

The University may facilitate the informal resolution process prior to conducting a hearing. Before the informal resolution process is used, both parties must provide voluntary, written consent to the informal resolution process and must receive written notice disclosing: the allegations, the requirements of the informal resolution process (including the circumstances under which it precludes the parties from resuming a formal complaint arising from the same allegations), and any outcomes resulting from participating in the informal resolution process (including the records that will be maintained or could be shared). At any time prior to agreeingto a resolution, any party has the right to withdraw from the informal resolution process and resume the Title IX Sexual Harassment grievance process with respect to the formal complaint.

The University will not require as a condition of enrollment or continuing enrollment, or employment or continuing employment, or enjoyment of any other right, waiver of the right toan investigation and adjudication of formal complaints of Title IX Sexual Harassment. Similarly, the University will not require, encourage, or discourage the parties from participating in the informal resolution process.

## *Investigation*

Following the receipt and review of the formal complaint by the University Sexual Misconduct/Title IX Coordinator, and it being determined that the matter properly falls under this Title IX Sexual Harassment policy, the parties will be informed in writing of the initiation ofthe investigation. The written information shall include:

- The identities of the parties, if known.
- A concise summary of the alleged conduct at issue (including when and where itoccurred, if known).
- Notice of the allegations potentially constituting Title IX Sexual Harassment.

- A statement that the respondent is presumed not responsible and that a determination regarding responsibility is made at the conclusion of the grievance process.

- A statement informing the parties that they may have an advisor of their choice, who may be, but is not required to be, an attorney.
- A statement informing the parties that they may request to inspect and review evidence.
- A statement informing the parties that knowingly making false statements or knowingly submitting false information during the grievance process may constitute a violation of University policy.
- Information regarding the applicable grievance procedures, including the informal resolution process.

If, during the investigation, additional information is disclosed that may also constitute prohibited conduct under this policy, the Respondent and Complainant will be informed in writing that such additional information will be included in the grievance process.

This investigation process will continue forward as explained absent the parties agreeing to use an informal resolution.

- ## Collection of Evidence

The investigators will collect information from each party. While the complainant and the respondent are not restricted from gathering and presenting relevant evidence, the investigators are responsible for gathering relevant evidence to the extent reasonably possible. However, each party will be given an equal opportunity to suggest witnesses; provide other relevant information, such as documents, communications, photographs, and other evidence; and suggest questions to be posed to the other party or witnesses. Parties and witnesses are expected to provide all available relevant evidence to the investigators during the investigation. If a party or witness fails to provide available relevant evidence during the investigation, such evidence may, at the discretion of the Decision Maker, be excluded from consideration at the hearing. While parties are not restricted from presenting information attesting to the parties' character, such evidence generally is not considered relevant.

Investigators will draft a complete investigative report, outlining material facts (those in dispute and not in dispute); collecting all Respondent, Complainant and relevant witness and impact statements; asking any needed follow up questions; and collecting and organizing all relevant evidence. The investigator will evaluate all relevant evidence – including both inculpatory and exculpatory evidence. This report will be reviewed by the Director of Student Conduct and the University

Sexual Misconduct/Title IX Coordinator for compliance and consistency purposes.

Credibility determinations will not be based on a person's status as a Complainant,Respondent, or witness.

## • Hearing Process

The report will then be turned over to a separate decision maker for adjudication. Thedecision maker may gather additional information, including speaking with any identified party.

The decision maker will then preside over a live hearing, in which advisors of both the Respondent and Complainant may cross-examine any individual that has made a statement or provided evidence, including any and all witnesses, the Respondent or theComplainant. Each party must be represented by an advisor. If the Complainant or Respondent does not have an advisor, the University will provide one. If the student's chosen advisor does not appear, the University will appoint an advisor to provide cross-examination of the evidence on the student's behalf. The decision maker will determineif a question or evidence is relevant or admissible. The decision maker may question witnesses, the Respondent and Complainant. At no time will advisors answeron behalf of their students.

The Decision Maker will have absolute discretion with respect to administering the hearing. The Decision Maker will decide whether evidence and witnesses are relevant orirrelevant, with the understanding that the introduction of relevant evidence and witnesses will always be permitted. The Decision Maker will be responsible for maintaining an orderly, fair, and respectful hearing and will have broad authority to respond to disruptive or harassing behaviors, including adjourning the hearing or excluding the offending individual, including a party, witness, or advisor.

While the hearing is not intended to be a repeat of the investigation, the parties will be provided with an equal opportunity for their advisors to conduct cross examination of the other party and/or of relevant witnesses. A typical hearing may include brief opening remarks by the Decision Maker; questions posed by the Decision Maker to one or both of the parties; questions posed by the Decision Maker to any relevant witnesses;and cross-examination by either party's advisor of the other party and relevant witnesses.

The parties' advisors will have the opportunity to cross examine the other party (and witnesses, if any). Such cross examination must be conducted directly, orally, and in realtime by the party's advisor and never by a party personally. Only relevant cross examination questions may be asked of a party or witness.

Before a party or witness answers a cross-examination question that has been posed by a party's advisor, the Decision Maker must first determine whether the question is relevant and explain any decision to exclude a question as not relevant.

If the complainant or the respondent informs the University that they will not attend the hearing (or will refuse to be cross-examined), the hearing may proceed, as determined by the University Sexual Misconduct/Title IX Coordinator. The Decision Maker may not, however: (a) rely on any statement or information provided by that non-participating individual in reaching a determination regarding responsibility; or (b) drawany adverse inference in reaching a determination regarding responsibility based solely on the individual's absence from the hearing (or their refusal to be cross-examined).

Other University administrators may attend the hearing at the request of or with theprior approval of the Decision Maker, but the parties will be notified in advance of anyone else who will be in attendance.

The decision maker will make a finding of responsible or not responsible for all charges and provide a rationale for each finding. The decision maker will make an independent decision based on a thorough review of all relevant evidence collected. The Decision Maker shall write a written determination, which will contain: (1) the allegations potentially constituting Title IX sexual harassment; (2) a description of the procedural steps taken from the receipt of the formal complaint through the determination (including any notifications to the parties, interviews with parties and witnesses, site visits (if any), methods used to gather other information, and the hearing); (3) findings of fact supporting the determination; (4) conclusions regarding the application of this policy to the facts; (5) a statement of, and rationale for, the result as to each allegation, including a determination regarding responsibility (i.e., whether a policy violation occurred), any disciplinary sanctions imposed by the Sanction Officer if there has been afinding of responsibility, and whether any remedies designed to restore or preserve equal access to the University's education program or activity or working environment will be implemented; and (6) relevant appeal information for the parties.

If there is a finding of responsibility, the decision maker will consider the scope of the case, impact on students and community and prior history when assigning sanctions. The decision maker will also decide if remedies are appropriate in order to restore or preserve equal access to their education at Tulane. Such remedies may include the sameindividualized services described as "Supportive Measures;" however, unlike Supportive Measures, remedies need not be non-disciplinary or non-punitive and need not avoid burdening the Respondent. All sanctions must be approved by the Director of Student Conduct and remedies

approved by the University Sexual Misconduct/Title IX Coordinator. Upon completion, cases will be turned over to the Office of Student Conduct and the Title IX office and any other appropriate administrators for sanction and remedy implementation.

A Respondent in these cases may acknowledge responsibility at any time and accept sanctions imposed by the Office of Student Conduct. A Complainant may withdraw thecomplaint at any time. Either of these occurrences would cease any investigation.

Sanctions for a finding of responsibility for these cases ranges from a warning to expulsion and may also include a variety of educational sanctions. Supportive Measurescannot be used as sanctions.

- ### Appeal

***The process for appeal is articulated along with the process for all other appeals of theconduct process, as explained here in the [Code in Part H](#).***

## *Training, Conflict of Interest, and Bias*

Individuals who fill certain roles in the Title IX Grievance Procedure must receive annual trainingto ensure awareness of their compliance obligations and in order to best provide equitable treatment to Complainants and Respondents and be compliant with the Grievance Procedures required by Title IX. These individuals are Title IX Coordinator, Deputy Coordinators, Investigators, Decision Makers (including appellate decision makers), and anyperson facilitating an Alternative Resolution Option within the Informal Process. Training subjects must include: the definition of Sexual Harassment as proscribed by the Title IX regulations; the scope of the University's education program or activity; how to conduct an Investigation and Grievance Process including Hearings, Appeals, and informal resolutionprocesses, as applicable.

Additionally, the Decision Maker(s) must receive training on any technology to be used at a livehearing and on issues of relevance of questions and evidence, including when questions and evidence about the Complainant's sexual predisposition or prior sexual behavior are notrelevant. Investigators must also receive the appropriate training needed to create an investigative report that fairly summarizes relevant evidence.

The Title IX regulations further require Tulane to make publicly available information on thesetrainings. A list of trainings attended by these individuals is available at https://tulane.box.com/v/titleixtraining. These are both internal and external trainings. The list includes the materials used in the training, all of which are provided for

public review. Thesematerials will be kept for seven years.

Further, any individual designated by Tulane as a Title IX Coordinator, Investigator, Decision Maker, or any person facilitating an Alternative Resolution Option withinthe Informal Process, will not have a conflict of interest or bias for or against Complainants or Respondents generally or an individual Complainant or Respondent. They will also be required to receive training on how to serve impartially, including by avoiding prejudgment ofthe facts at issue, conflicts of interest, and bias. Any materials used to train Title IX Coordinators, investigators, decision-makers, and any person facilitating an Alternative Resolution Option within the Informal Process must not rely on sex stereotypesand must promote impartial investigations and adjudications of Formal Complaints of Sexual Harassment. Any training materials on these subjects will be publicly shared in the manner described in the training section above.